## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER, ET. AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO:  06-7185** |
| **ST. BERNARD PARISH, ET AL.** | **SECTION: "C" (1)** |

## ORDER AND REASONS

In the wake of the devastation wrought by Hurricane Katrina, St. Bernard Parish officials have had to rebuild their parish and community from near total ruin.  The question presented to this Court is what limits are imposed under the law and the prior negotiated Consent Order to their efforts to shape the housing stock available, and thus the population, in the parish.  Before the Court is plaintiff Greater New Orleans Fair Housing Action Center's ("GNO") and intervenor Provident Realty Advisors, Inc.'s ("Provident") Motion to Enforce Consent Order (Rec. Doc. 126.)  Plaintiff and intervenor claim that in September 2008, defendants enacted a moratorium that violates the terms of a previous consent order governing this case.  Defendants oppose.  (Rec. Doc. 154.)  This Court held an evidentiary hearing on March 11 and 12, 2009 to determine whether the moratorium did in fact violate the terms of the consent order previously entered into by plaintiffs and defendants. Based on the evidence and testimony produced by the parties, the memoranda and arguments of counsel, the applicable law and the record in this case, the Court grants plaintiff's and intervenor's Motion to Enforce the Consent Order for the following reasons.

# I.    BACKGROUND

The parties to this matter entered into a Consent Order, which was approved by this Court

on February 27, 2008.  (Rec. Doc. 114.)  The consent order settled plaintiffs' allegations that

defendants violated the Fair Housing Act of 1968, 42 U.S.C. § 3601, and 42 U.S.C. §§ 1981-83 in

enacting several housing ordinances.  The plaintiffs alleged that the ordinances were enacted with

the intent and effect of discriminating against minorities and plaintiffs sought in particular a

preliminary injunction to stay the operation of the so-called "blood relative ordinance."[1]  Pursuant

to the terms of the injunctive relief section of the Consent Order, St. Bernard Parish was enjoined

from

> violating the terms of the federal Fair Housing Act, and 42 U.S.C. §§ 1981, 1982,
> and 1983. Specifically, St. Bernard Parish agrees that it shall not:
>
>> A.   Refuse to rent a dwelling unit, or otherwise make unavailable or deny
>> a dwelling unit, to any person because of race or national origin;
>> B.   Deny minority citizens the same rights as are enjoyed by white
>> citizens to make and enforce contracts;
>> C.   Deny minority citizens the same rights as are enjoyed by white
>> citizens to lease, hold and otherwise enjoy real property;
>> D.   Deny any person equal protection of the law by discriminating on the
>> basis of race and national origin in the leasing of real property; and,
>> E.   Retaliate against Plaintiffs or any other person who alleges that
>> Defendants have violated the Fair Housing Act, 42 U.S.C. § 3601 et seq.

(Rec. Doc. 114 at ¶ 9.)  GNO and St. Bernard Parish specifically agreed to the continuing

jurisdiction of this Court for a period of three years from February 27, 2008 to resolve disputes

---

[1] The parties refer to the "blood relative" ordinance as shorthand for a housing ordinance passed by the St. Bernard Parish Council on September 19, 2006, that stated: "No person . . .shall rent, lease, loan, or otherwise allow occupancy or use of any single-family residence located in an R-1 zone by any person or group of persons, other than a family member(s) related by blood within the first, second or third direct ascending or descending generation(s), without first obtaining a Permissive Use Permit from the St. Bernard Parish Council." (Rec. Doc. 114 at 2.)

regarding interpretation or compliance with the Consent Order.  (Id. at 8, ¶ 12.)

On December 18, 2008, GNO and Provident filed a motion to enforce the February 7, 2008 Consent Order. (Rec. Doc. 126.)  They claimed that a ordinance passed by the Council in September 2008 violated the consent order entered in this case.  The challenged ordinance placed a moratorium on the construction of all multi-family housing (i.e. buildings with more than 5 units) for a period of twelve months or until the Council enacted certain zoning updates. (Pls.' Evid. Hr'g Ex. 31.)  At the time of the introduction and passage of the contested moratorium, and with the knowledge of certain St. Bernard Parish officials, Provident, a real estate development corporation, had initiated the process of constructing four affordable housing developments in St. Bernard Parish.  GNO and Provident allege that the moratorium violated the Fair Housing Act (FHA), 42 U.S.C. §3604(a), by making housing unavailable on the basis of race.  Plaintiff and intervenor claim the moratorium was enacted with discriminatory intent and/or has a discriminatory effect in violation of the Fair Housing Act and the Consent Order. (Rec. Doc. 126).  GNO and Provident request the Court "direct St. Bernard Parish to rescind the moratorium and enjoin the Parish from enforcing the moratorium until it is repealed." (Id. at 2.)

The following facts were undisputed at the evidentiary hearing.  The proposed Provident developments consist of four mixed-income rental apartment complexes with 72 units each. (Pls.' Evid. Hr'g Ex. 12 at 2.)  Thirty percent of these units will be rented at fair market rates. (Id.)  Fifty percent will be at 60% of Area Median Income ("AMI").  (Id.)  Twenty percent  will be at 30% of AMI.   (Id.)   The estimated cost of the developments is $60 million dollars.  (Evid. Hr'g Tr. 16-19, Mar. 11, 2009)(hereinafter "Tr. Mar. 11 Hr'g.")  The majority of funding for these complexes was specifically geared towards providing affordable housing, thus the income

restrictions and lowered rent on 70% of the units. $20 million of the funding would come from Community Development Block Grant funds, administered by the Louisiana Recovery Development Program. (Id.) $30 million would be provided in Low Income Housing Tax Credits. (Id.) The final $10 million required to fund the developments was expected to come from a permanent loan from Freddie Mac. (Id.)

## II.     LAW AND ANALYSIS

## A.     Disparate Racial Impact

Central to determining both discriminatory intent and discriminatory effect is an assessment of whether or not the challenged law has a disparate racial impact. *See Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989)(describing standard for discriminatory intent); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996)(noting discriminatory effect under the FHA may be proven with evidence of a "significantly greater discriminatory impact.") Based on the methodology of *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) and *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 650-651 (1989), both of which assessed disparate racial impact in employment cases[2], this Court finds the "proportional numbers" analysis of Dr. Calvin Bradford, plaintiff's statistical expert, particularly convincing.[3]

---

[2] *See e.g.*, *Kormoczy v. Secretary, U.S. Dept. of Housing and Urban Dev.*, 53 F.3d 821, 824 (7th Cir. 1995)(using employment discrimination framework to assess fair housing claim).

[3] Prior to the hearing, defendants moved to strike the testimony of Dr. Calvin Bradford because he used "proportional numbers" instead of "absolute numbers," relying upon *Summerchase LTD Partnership v. City of Gonzales, et. al.,* 970 F.Supp. 522, 528-529 (M.D. La. 1997)(discussing *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 650-651 (1989)). This Court denied defendants' motion because at a minimum, the caselaw evidenced use of both proportional and absolute numbers and therefore Dr. Bradford's testimony was not based on unreliable methodology under *Daubert*. (Rec. Doc. 226). However, this Court also noted her contrary reading of *Wards Cove*, which this Court understood to implicate not the propriety of proportional numbers *writ large* but rather which categories of proportional numbers were most appropriate in establishing disparate impact. 490 U.S. at 650-651. This Court's analysis and

Dr. Bradford has thirty-five years of experience in the area of housing discrimination, including financing, foreclosure, housing markets, and disparate impact analysis.[4] (Tr. Mar. 11 Hr'g 68-71). Dr. Bradford performed a series of statistical regressions to assess the impact of the moratorium on different racial groups. His results, summarized below, were statistically significant to a 99% confidence level. According to his analysis, the moratorium has a disparate impact on African-Americans in three ways.

First, the moratorium has a disparate impact on African-Americans by reducing the amount of available housing structures with 5 or more units. 17.61 % of African-American households in the New Orleans metropolitan area live in structures with 5 or more units, compared to only 9.54% of Caucasian households. (Pls.' Evid. Hr'g Ex. 40 at 10.) African-American households are 85% more likely to live in structures with more than 5 units than Caucasian households. (Id.)

Second, African-Americans are disproportionately affected because the moratorium reduces the supply of rental properties. Over 90% of structures with more than 5 units are rental structures. 51.7% of African-American households in the New Orleans metropolitan area live in rental units, compared to just over 25% of Caucasian households. (Id. at 10-11.) African-American households are twice as likely as Caucasians to live in rental housing. (Id. at 11.)

_____

approval of proportionate numbers in disparate impact cases in the fair housing context is further buttressed by a sister court's reliance on same for a similar issue (*Dews v. Town of Sunnyvale, Texas*, 109 F. Supp. 2d. 526 (N.D. Texas 2000)) and the analysis of the Second Circuit (*Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir.), *aff'd*, 488 U.S. 15 (1988)(affirming outcome without endorsing the "precise analysis.").

[4] The Court admitted Dr. Calvin Bradford as an expert in disparate impact and housing discrimination.

Third, African-American households are far more likely to have incomes within the income ranges for the proposed affordable housing developments. (Id. at 11-12.) Just over 17% of African-American households have incomes in the lowest income range served by the affordable housing developments (30% of AMI), compared to 9.27% of Caucasian households. (Id. at 12.) Focusing on families as opposed to households, 14.29% of African-American families fall within the lowest income range, compared to only 4.6% of Caucasians. Put differently, African-American families are more than three times as likely as Caucasian families to have incomes within that range. (Id. at 13.) In the higher income range (60% of AMI), approximately 21% of African-American households fall within that income category, compared to 14.28% of Caucasian households. Again, focusing on families as opposed to households, 22.17% of African-American families fall within the higher income range, compared to 11.88% of Caucasian families. African-American families are 87% more likely to have incomes within this next highest income range than Caucasian families. (Id. at 12-13.)

Defendant's housing expert,[5] Dr. Wade Ragas, challenged Dr. Bradford's reliance on data from the New Orleans metropolitan statistical area ("MSA") instead of data solely relating to St. Bernard Parish. However, the Court finds Dr. Bradford's reliance appropriate. St. Bernard Parish encompasses both decidedly rural areas, particularly further out towards the wetlands, and also more populous areas near the city limits of New Orleans. The actual proposed developments are situated in the northwest area of the parish, i.e. areas closer to the parish borders with Jefferson and Orleans and the city limits of New Orleans. Indeed, the population of

_____

[5] Dr. Wade Ragas was admitted as an expert to testify regarding housing market analysis, trade and market areas analysis, planning and zoning processes, particularly with affordable housing projects. Based on the lack of foundation in the record, Dr. Ragas was not admitted as an expert in disparate impact analysis.

St. Bernard Parish is concentrated in this same general area and along the river. (Tr. Mar. 11 Hr'g 121.) The New Orleans MSA, including St. Bernard Parish, also operates as a regional economic market and housing is a regional asset in that market. (Id. at 12; Evid. Hr'g Tr. 112, March 12, 2009)(hereinafter "Tr. Mar. 12 Hr'g"). Moreover, the Court credits Dr. Bradford's testimony that statistically speaking, to avoid circular analysis, focusing on St. Bernard Parish alone does not answer the primary question (which is what is the effect of the moratorium on housing available to different racial groups) when everyone living in St. Bernard Parish presumably has housing of some sort already. (Tr. Mar. 11 Hr'g 88.)

Buttressing the statistical evidence, testimony at trial indicated that a substantial portion of the expected rental tenants would not be Caucasian. Matt Harris, a Managing Director for Provident, testified that based on his experience and the current leasing of similar mixed-income units in Louisiana on the Northshore and in Texas, he would expect the rental population to be approximately 50% African-American, 25% other minority, and 25% Caucasian. (Tr. Mar. 11 Hr'g 47.)

Based on the above findings, the Court finds that the moratorium on the development of housing structures with more than five units to have an disparate racial impact on African-Americans.

**B.    Discriminatory Intent**

To assess whether or not discriminatory intent exists, the Fifth Circuit, citing the Supreme Court, has held the following circumstantial evidence factors to be both pertinent and non-exhaustive: "(1) the historical background of the decision, (2) the specific sequence of

events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989)(*citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)). In short, plaintiff and intervenor must establish "that race was a consideration and played some role in the real estate transaction." *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986).

(1) the historical background of the decision

The moratorium at issue today is strikingly similar to one of the ordinances challenged in the 2006 litigation that resulted in the voluntary consent decree. On November 1, 2005, the Council enacted a twelve-month moratorium on the "re-establishment and development of any multi-family dwellings in St. Bernard Parish." (Pls.' Evid. Hr'g. Ex. 28.) Plaintiffs' claims regarding the legality of this, as well as other, ordinances were settled by virtue of the Consent Order. (Rec. Doc. 114 at ¶ 17)(noting that parties were released from all claims "arising out of the facts alleged in the litigation.") On September 16, 2008, the Council enacted the current moratorium. This moratorium prohibited the construction of all "multi-family residential and/or any housing developments with five or more units for up to twelve (12) months or until such time as the Council approves these structures in the zoning updates to the St. Bernard Parish Code of Ordinances." (Pls.' Evid. Hr'g. Ex. 31, Ordinance #905-09-08). Both ordinances prohibited the development of multi-family housing; both were applicable parish-wide.

In a similar vein, the Court finds the so-called "blood relative" ordinance relevant to the history of the challenged ordinance. St. Bernard Parish is an overwhelmingly Caucasian parish,

particularly in comparison to its neighbors. Based on 2000 census data, Dr. Bradford found that the racial composition for the entire New Orleans MSA was 57.4% Caucasian and 37.4% African-American. (Pls.' Evid. Hr'g. 40 at 6.) However, the African-American population was highly concentrated in sections of Orleans, Plaquemines, and Jefferson Parish. (Id.; *see also* Id. at Attach. C.) For example, the city of New Orleans included 66.3% of the African-American population of the entire metropolitan area, even though it accounted for only 36.8% of the area's total population. Comparing neighboring parishes Orleans to St. Bernard further demonstrates the stark racial contrast. 67.3% of the Orleans Parish population was African-American and 28.1% was Caucasian. (Pls.' Evid. Hr'g. Ex. 40 at 6.) St. Bernard Parish, however, was 88.3% Caucasian and 7.6% African-American. (Id.)

Within this racial context, the "blood relative" ordinance was introduced. In September 2006, the St. Bernard Parish Council enacted an ordinance, introduced by then Councilperson Craig Taffaro, to prohibit the rental or occupancy of a single family residence to someone other than a blood relative without first obtaining a permissive use permit. (Pls.' Evid. Hr'g. Ex. 27.) Mr. Taffaro later stated that the purpose of the "blood relative" ordinance was to "maintain the demographics of St. Bernard Parish." (Tr. Mar. 12 Hr'g 44.) Given that St. Bernard Parish is overwhelmingly Caucasian, plaintiff claimed the ordinance was racially discriminatory since African-Americans de facto became ineligible for rental housing in the Parish. (Rec. Doc. 3). Indeed, Council Chairperson Lynn Dean, who voted against the ordinance, said the ordinance was racially motivated and was clearly intended to preserve the nearly all-Caucasian demographic of the parish. (Tr. Mar. 12 Hr'g 43.) Mr. Taffaro acknowledged that the Council even considered censoring Mr. Dean for his allegations. (Id.).

To be clear, the settlement of the prior claims does not result in an inference of liability

on behalf of the defendants, any more than it results in an inference of a frivolous claim by plaintiffs. Rather, the similarity between the 2005 multi-family ordinance, the 2008 ordinance, and the history of the "blood relative" ordinance is striking, independent of the settlement. They evidence repeated attempts to restrict certain types of housing in a parish whose housing stock, along with other structures, was largely obliterated. As was shown by Dr. Bradford, *supra*, the type of housing restricted or forbidden is disproportionately utilized by African-Americans. Noteworthy too is the involvement of some of the same public officials in the ordinances. For example, Councilperson Kenneth Henderson served during both relevant time periods; then Councilperson Craig Taffaro introduced both the 2005 multi-family ordinance and the 2006 "blood relative" ordinance and in 2008 as Parish President, he testified he had no reason to use his veto power to reject the 2008 ordinance. (*Compare* Pls.' Evid. Hr'g. Ex. 28 with Pls.' Evid. Hr'g. Ex. 31; Tr. Mar. 11 Hr'g 253.)

(2) the specific sequence of events leading up to the decision

The Court is also particularly troubled by the sequence of events preceding the Council's enactment of this moratorium. On July 14, 2008, Provident developer Matt Harris met with several St. Bernard Parish officials, including Parish President Craig Taffaro, Parish Sheriff Jack Stephens, and Councilmen Ray Lauga and George Cavignac, to discuss Provident's proposed developments. (Rec. Doc. 126-5 at ¶ 15.) At that time, Provident had already commissioned a "study of the multi-family rental market in the Chalmette, Louisiana area" by a national firm. (Pls.' Evid. Hr'g. 5.) Provident, upon learning in early 2008, that developments in St. Bernard Parish would receive additional points in competing for federal tax credits, had also contacted and met with local landowners prior to the July 14, 2008 meeting. At the July 14 meeting, Harris

and another Provident representative discussed the quality of the apartments, the mixed-income guidelines, the financial incentives for maintaining the property, and showed the St. Bernard officials sketches of the proposed development. ( Tr. Mar. 11 Hr'g. 26). While some questions arose as to who would actually occupy the units, it was not a big focus of the meeting. (Id.) St. Bernard Parish officials discussed how the developments would not cost the parish any money; in fact, the developments were expected to create $40,000 in tax revenue each year for the parish. (Id.; Tr. Mar. 12 Hr'g 26, 76). Ray Lauga, the Councilperson for the district of three of the planned developments, testified that he told Harris he would "work with them" and was "very interested in having a multi-family development be developed with the higher codes, higher standards in place." (Tr. Mar. 12 Hr'g 81.) Ray Lauga was personally impressed with Matt Harris and knew the project would bring in $60 million dollars of investment to the parish. (Tr. Mar. 12 Hr'g 75.) The Court surmises the meeting went well - on July 23, 2008, Jerry Graves, the Director of Community Development for St. Bernard Parish certified in writing that the properties were properly zoned for each of the four proposed developments. (Pls.' Evid. Hr'g. Ex. 6.)

On August 7, 8, 9, 2008, Provident ran a "Notice to the Public" for each of the four developments announcing its application for housing tax credits and Community Block Development Grants in the Times-Picayune newspaper. (Pls.' Evid. Hr'g. Ex. 59). The notice described the developments as "a new construction garden style apartment community for families" and providing "supportive services such as after school programs on a voluntary basis, adult basic education, and personal finance." (Id.) The developments were clearly identified as "mixed income" and consisting of a maximum of 72 units per development. (Id.).

On Saturday, August 16, 2008, an editorial appeared on the front-page of The St. Bernard

Voice, the official newspaper of St. Bernard Parish, that read in part:

> Should St. Bernard residents be concerned? Ours was a crime free community of homeowners with a deep appreciation for shared values… Is that now threatened?
>
> The local newspaper had three entries in its legal notices this past week. All three relate to the use of private and public money to construct a total of 216 apartments in three selected sites in the parish…
>
> . . . The fact that each development mentions that it will provide "supportive services in a community facility including … after school programs on a voluntary basis, adult basic education, and personal finance" may provide some insights into the background of the intended occupants …
>
> Less we forget, Village Square started out as a middle class housing development that catered to teachers, other professionals, and their families. It was a wonderful place to live...when first opened.
>
> After a number of years, ownership changed, maintenance diminished, and the quality of renter fell to a much lower social/economic class. Result: Village Square became what can only be described as a ghetto with drugs, crime, vandalism, and violence.
>
> That is generally the case with high density housing. It was just because such problems persist in that type of environment that HUD demolished the concentrated lifestyles of the "New Orleans Projects." Is St. Bernard about to buck the trend and construct them here in St. Bernard? What guarantees have the residents of St. Bernard that their tax money is not going to be used to create the kind of blight New Orleans recently destroyed?
>
> But the fact remains that residents know little about what is going on, [and] are not impressed when they hear the term "mixed income development" mentioned in the project description…

(Pls.' Evid. Hr'g. Ex. 11; Tr. Mar. 11 Hr'g 219.)

The references to "ghetto," "crime," "blight," and "shared values" are similar to the types of expressions that courts in similar situations have found to be nothing more than "camouflaged racial expressions." *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (affirming

that statements about "undesirables," and concerns about personal safety due to "new" people are "camouflaged racial expressions"); *Atkins v. Robinson*, 545 F. Supp. 852, 871-72 (E.D. Va. 1982) (finding statement that she "feared the projects 'would degenerate to slum-like conditions, with an abundance of crime" to be a veiled reference to race).   In the Title VII hostile work environment context, "ghetto" is repeatedly associated with race.[6]  *See e.g., Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348 (5th Cir. 2007)(noting isolated references to "ghetto children" as "perhaps racially inappropriate");  *Harrington v. Disney Regional Entm't, Inc.*, 276 Fed.Appx. 863, 876-877 (11th Cir. 2007) (indicates "ghetto" was a racial slur); *see also Clark ex rel T.M.J. v. Pielert,* 2009 WL 35337 (D.Minn. 2009)(noting "ghetto" was a "racially-charged term" in the §1983 context preventing summary judgment on qualified immunity). Furthermore, the Village Square complex cited in the article is a multi-unit housing complex in St. Bernard with a significant African-American population.  Plaintiffs' witnesses described Village Square as predominantly African-American or minority and defendants' witnesses characterized Village Square as "mixed." (Tr. Mar. 11 Hr'g. 53, 59-60, 226; Tr. Mar. 12 Hr'g. 73.)  At the same time, St. Bernard Parish, in general, is overwhelmingly Caucasian. (Tr. Mar. 11 Hr'g. 52; Tr. Mar. 12 Hr'g 19, 44.)  Given the racial demographics of the parish in general and that Village Square has a significantly higher African-American population than the parish at large, the Court finds that the references to Village Square in this context are racially-loaded.

The Court is also not persuaded by the disavowals of President Craig Taffaro and Councilperson Ray Lauga that the editorial did not refer indirectly to race.  First, the Court is just as able as either witness to give a lay impression and interpretation to the written editorial.  The

---

[6] The standard in those cases is notably different, namely the severity of the challenged slur to create a hostile work environment.

references to ghetto, crime, drugs, violence, the Village Square, and to the Housing and Urban Development New Orleans Projects juxtaposed against their "threat" to the "shared values" of overwhelmingly Caucasian St. Bernard Parish clearly is an appeal to racial as well as class prejudice. Additionally, even Mr. Taffaro seemed at pains to evade a straight answer to plaintiffs' questioning on the subject, although he did eventually testify that he did not think the various terms constituted camouflaged racial expression. (Tr. Mar. 11 Hr'g. 222-232, 228)(noting that he would not have written the article.)

Not surprisingly, a public outcry followed publication of the editorial. (Tr. Mar. 12 Hr'g. 75.) Ray Lauga testified that he had constituents calling his office expressing concern over the developments. (Tr. Mar. 12 Hr'g. 79.)

Two business days later, on Tuesday, August 19, 2008, Ray Lauga introduced to the Council the moratorium at issue in this case, Ordinance SBPC #905-09-08. (Pls.' Evid. Hr'g. Ex. 31). Councilman Lauga admitted that public opposition to the Provident developments was a factor in the introduction of the multi-family moratorium. (Tr. Mar. 12 Hr'g. 85.)

On August 26, 2008, the foundation that owned the land for the proposed developments, organized an informational meeting for the leadership of the St. Bernard community and Provident. (Tr. Mar. 11 Hr'g. 30, 235.) Attendees included the author of the editorial, the school superintendent, Mr. Taffaro, Mr. Lauga, and the sheriff, among others. (Tr. Mar. 11 Hr'g. 30.) At the meeting, Provident developer Matt Harris answered questions regarding the lower-income units of the development, the screening policies, including for criminal history of the applicants, and the possibility of pre-leasing to elderly and government employees from St. Bernard parish. (Id. at 30, 32, 34.) Mr. Harris was asked to step out of the room while the attendees discussed the project. (Id. at 31.) When he was invited to return, he was informed that

the attendees had agreed to support the development. (Id.) Mr. Harris understood that as long as the moratorium was in place, it would completely block the Provident developments from going forward, but after speaking with Councilperson Lauga, was reassured that the moratorium was a temporary and necessary measure to address the public outcry and address improved design standards. (Tr. Mar. 11 Hr'g. 34.)

On September 9, 2008, Provident provided proposed design standards to Councilperson Lauga. (Pls.' Evid. Hr'g. 72; Tr. Mar. 12 Hr'g. 87.) Mr. Lauga did not contact anyone at Provident to discuss the proposed standards. (Id.)

On September 18, 2008, the Council unanimously adopted Ordinance #905-09-08, placing a moratorium on all housing developments with five or more units "for up to twelve months or until such time as the Council approves these structures in the zoning updates to the St. Bernard Parish Code of Ordinances." (Pls.' Evid. Hr'g. Ex. 31.)

Interestingly, no action was taken on the design standards submitted by Provident in September until Councilperson Lauga introduced substantially similar standards to the Council on December 16, 2008. Noteworthy, perhaps, is that plaintiff had begun writing to parish officials warning them of non-compliance with the consent order as of December 1, 2008. (Pls.' Evid. Hr'g. Ex. 32.) Intervenor Provident had already presented a draft legal complaint to parish officials at a November 21, 2008 meeting (Tr. Mar. 12 Hr'g. 23.)

Taken as a whole, the Court is disturbed by this relatively undisputed timeline of events. The initial positive reaction, including letters noting the developments were properly zoned, immediately eroded following the publication of the editorial. Although Mr. Lauga first claimed the timeline was "convenient," he later admitted that the outcry over Provident was a factor in the introduction and eventual passage of the moratorium. (Tr. Mar. 12 Hr'g. 83, 85.)

15

(3) departures from the normal procedural sequence

Kalima Rose,plaintiff's expert on affordable housing, testified about the normal process for enacting a moratorium in relation to a proposed construction project. Ms. Rose testified that "when communities are in the middle of zoning changes, they sometimes call moratoria if somebody's asking for a variance of use." (Tr. Mar. 11 Hr'g. 183.) Ms. Rose explained that if an area is zoned for one particular use but is in the process of being changed for use in another way (for example, from industrial to mixed-use) and if a developer is seeking a variance along those same lines, then a moratorium may be enacted to ensure the most up-to-date code governs the developer. (Id.) But when, as here, land is zoned for a particular use and a developer seeks a permit to build **for that use**, a moratorium is not a normal occurrence. (Id.) Ms. Rose's testimony on the irregularity of this moratorium is in fact supported by testimony from Dr. Wade Ragas, an expert for the defense. In his written report, Dr. Ragas stated that a moratorium is a common planning tool used by local councils. (Defs.' Evid. Hr'g. Ex. 3 at ¶ 16). Elaborating on this point in his testimony at the hearing, Dr. Ragas gave several examples of other moratoria in Orleans and Jefferson parishes. (Tr. Mar. 12 Hr'g. at 140.) However, all of those examples concerned moratoria that were limited in geographic scope to a particular area instead of a blanket moratorium on all construction of certain structures.[7] (Id.) Taken together, this Court finds that the moratorium at issue in this case - because it did not involve a variance and was not limited in geographic scope - departs from the normal procedure regarding local zoning moratoria.

_____

[7] The Court also notes that text of the ordinance indicates that the moratorium could be indefinite. The text states the moratorium lasts "for up to 12 months <u>or until such time</u> as the Council approves these structures in zoning updates." (Pls.' Evid. Hr'g. Ex. 31).

"Substantive departures" are usually indicated when "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights*, 429 U.S. at 267.

As previously discussed, St. Bernard Parish officials recognized significant beneficial aspects of the proposed development, including the economic investment of $60 million dollars in their parish and the estimated annual $40,000 tax revenues. (Id.; Tr. Mar. 12 Hr'g. 26, 75, 76.) Since Hurricane Katrina, St. Bernard had been aggressively pursuing funding and infrastructure projects to get St. Bernard back on its feet (Tr. Mar. 12 Hr'g. 260), and indeed, appeared to support the Provident developments until the publication of the editorial decrying the developments in August 2008. Many of the justifications now cited by defendants to legitimate their opposition to the developments appear contrived, particularly in light of the substantial benefits of Provident's plan.

*Justification #1 - Lack of infrastructure*

On November 12, 2008, Councilmembers Wayne Landry and George Cavignac sent a letter to the Louisiana Housing Finance Agency expressing their strong opposition to the development. (Pls.' Evid. Hr'g. Ex. 15.) In their letter, the councilmembers claim that St. Bernard Parish does not have the required infrastructure, including medical care, to support the developments. (Id.) This stands in stark contrast to a October 9, 2008 letter by Parish President Craig Taffaro to the same agency noting that the required infrastructure **was** in place to support the project. (Pls.' Evid. Hr'g. Ex. 14.) In fact, if Mr. Taffaro had been presented with the

Landry/Cavignac letter before it was sent, he would have asked them not to send it because it did not accurately state the level of infrastructure. (Tr. Mar. 12 Hr'g. 20-21.) Moreover, in June 2008, a deal was announced for the creation of a 40-bed hospital in the parish. (Tr. Mar. 12 Hr'g. 9.)

*Justification #2 - Affordable housing not needed*

Defendants also dispute that St. Bernard Parish needs additional affordable housing. In the same objection letter, Councilmembers Landry and Cavignac claimed that St. Bernard Parish was "flush" with rental properties. (Pls.' Evid. Hr'g. Ex. 15.) Faced with the conflicting testimony of Kalima Rose, plaintiff's expert in affordable housing, and Dr. Wade Ragas, defendants' expert in the local housing market, the Court finds the methodology of Ms. Rose more reliable and thus more persuasive. Dr. Ragas based his analysis solely on a snapshot of the parish's current condition. Ms. Rose took a more comprehensive and regional approach in her analysis, assessing not only the current but also projected trends in employment and housing which correlated with when the new housing would actually come online. (Pls.' Evid. Hr'g. Ex. 41 at 3.) This included assessing the projects for which funds have been obligated by the federal government, which totals close to $1 billion for St. Bernard Parish alone (Id. at 11.) For example, in Ms. Rose's opinion, even if St. Bernard Parish proceeded with all of the currently allocated federal resources and projects (including Provident), it would only replace twenty percent of its lost rental stock. (Id. at 5, 13.) In addition, 25% of workers in St. Bernard Parish can not afford a two-bedroom apartment at current market prices. (Id. at 12.) Provident's developments would become available in 2010 at the earliest and therefore the appropriate question is whether St. Bernard Parish and the surrounding areas will require additional

affordable rental housing beyond the current stock. Based on her expertise and work in affordable housing policy following Hurricane Katrina, Ms. Rose concluded that substantial public and private investment in rebuilding of infrastructure and business will spur job creation and draw large numbers of low-wage workers to the area. (Id.) The Court finds these conclusions well-supported by both the methodology and facts.

Dr. Ragas, in contrast, focused his attention primarily on St. Bernard parish, with scant attention to future trends in the region. Furthermore, several errors in his analysis of comparable rental developments seriously undermine his conclusions that Provident's developments would not be competitive. First, he admitted that he only did a cursory review of information contained in intervenor's market study conducted in June 2008. (Tr. Mar. 12 Hr'g. 125-127.) He also did not examine data and reports after October 2008, even though his final report is dated February 20, 2009. (Id. at 126.) One "comparable" development, which he indicated was not going forward did in fact receive funding and was going forward. (Id.)

Second, he failed to ensure that his comparisons were appropriate. For example, the Provident rents cited by Dr. Ragas included utilities, whereas rents for other developments cited by Dr. Ragas did not. (Id. at 174.) Certain types of apartments were also unique to Provident, such as three bedroom, two bath apartments. (Id. at 176.) And at least in comparison to one Ragas "comparable," the Provident provides greater square footage. (Id. at 177.) Even using the analysis as presented by Dr. Ragas, it actually supports the competitiveness of the Provident developments. According to Dr. Ragas, one of his comparables, the Palm Gardens Apartments has a 90% occupancy rate. (Pls.' Evid. Hr'g. Ex. 71 at 10.) According to Mr. Harris and even President Taffaro, a 90% occupancy rate is considered to be sufficient for this type of housing and Provident's proposed developments would be profitable with a 90% occupancy rate. (Tr.

Mar. 11 Hr'g. 20; Tr. Mar. 12 Hr'g. 12.)

*Justification #3 - Possibility of abandonment*

At the hearing, defense witnesses expressed the fear that Provident will fail to maintain, and/or ultimately abandon the properties. Provident's Matt Harris described, to the Court and previously to St. Bernard officials, that the low income housing tax credit program was specifically designed to counter these concerns. Essentially, one of the sources of financing is tax credits for a ten-year period, which are sold to a Fortune 500 company, who becomes the "tax credit investor." (Tr. Mar. 11 Hr'g. 18.) If the property is not maintained in accordance with the credit program guidelines, which includes inspection, the tax credits are no longer valid and Provident would be financially liable for those credits. (Id.) In addition, there is a "fifteen year clawback" provision, i.e Provident must maintain the properties under these guidelines for five additional years after the ten year tax credit period, or the government is entitled to recapture the credits. (Id.) After fifteen years, Provident will have no remaining debt on the property and its profits would then presumably increase, making the property more valuable to Provident and worthy of protecting. (Tr. Mar. 12 Hr'g. 16.) Defendants have offered no specific basis for their asserted fear that Provident will abandon the buildings as soon as the fifteen years are up, the debt service completed and therefore at the very moment that they would yield a greater return. As President Taffaro conceded, such a decision would not be in Provident's rational business interest. (Tr. Mar. 12 Hr'g. 16-17.)

*Justification #4 - Moratorium had another target: Village Square*

At the evidentiary hearing, Mr. Lauga claimed that possible redevelopment of a housing

development called Village Square prompted the moratorium. (Tr. Mar. 12 Hr'g. 82, 89.)

Village Square, generally described as a "high-density" multi-family development, was

characterized as a hazard to the "health, safety, and welfare" of the St. Bernard community. (Id.

at 79.) Parish officials were concerned that Village Square would come back in a "sub-standard"

fashion. (Id. at 82.) According to Mr. Lauga, the moratorium was necessary because certain

developer purchase agreements related to Village Square were slated to expire. (Id.) The Court

is not persuaded. First, as noted previously, Mr. Lauga also conceded that the Provident

development was a factor in the moratorium. (Tr. Mar. 12 Hr'g. 83, 85). Second, the focus of

the moratorium could have been more narrowly tailored to the specific Village Square area, such

as the Orleans moratorium was regarding the footprint of a planned hospital. (*See* Tr. Mar. 12

Hr'g. 140).

*Justification# 6 - Codification of design standards/Zoning update*

Finally, as noted previously, defendants have claimed the moratorium was justified by

the need to update the zoning code, including codifying design standards prior to the Provident

developments going forward. Defendants have failed to demonstrate any evidence of substantive

action on the design standards since Provident supplied a proposal in September 2008.

Defendants did not engage Provident about its proposed design standards. (Tr. Mar. 12 Hr'g. 87,

88). As to the zoning update, in April 2008, Donald Poland was commissioned to recommend

revisions and updates to the St. Bernard zoning code. (Defs.' Evid. Hr'g. Ex. 2). His report was

issued in May 31, 2008, but according to Matt Harris of Provident, Mr. Poland's study was not

mentioned in any of his discussions with parish officials in July and August 2008. (Tr. Mar. 11

Hr'g. 27). Mr. Lauga testified that Provident knew generally of the ongoing zoning update

process.  (Tr. Mar. 12 Hr'g. 87, 86.)  Based on the testimony at trial, however, it is likely that even if Provident knew of the proposed zoning update, it had no reason to know that the zoning update would affect the proposed developments.  For example, the July 23, 2008 letters from the parish government indicated that each development's property was properly zoned and therefore any contemplated zoning update would not necessarily have affected the proposed developments.  (*See* Pls.' Evid. Hr'g. Ex. 6.)

None of the six justifications, individually or collectively, are persuasive as legitimate reasons for the St. Bernard parish government's abrupt change of heart, particularly given the financial benefits to the parish from the proposed developments.  Accordingly, the Court concludes that the opposition to the Provident project is a "substantive departure" from normal decision-making.  The Court also concurs with Ms. Rose's opinion that it is mystifying why "anybody would be hampering resources that can move quickly, because there are so many resources that have not moved quickly through FEMA and other channels" and risk "jeopardiz[ing] [a] project that's needed so greatly."  (Tr. Mar. 11 Hr'g.183-184.)

(5) legislative history

While little comment was made publicly regarding the motive behind the moratorium, Councilperson Lauga admitted at trial that the public outcry regarding the Provident developments played a role.  (Tr. Mar. 12 Hr'g. 85.)  Moreover, the historical backdrop to the consent decree and the prior ordinances and the swift introduction of this ordinance only three days after the editorial is also indicative of the racial and class animus underlying the ordinance.

Based on all of the evidence discussed above, the Court concludes that the Parish and Council's intent in enacting and continuing the moratorium is and was racially discriminatory, and as such defendants have violated the Fair Housing Act, 42 U.S.C. §3604(a), 42 U.S.C. §§ 1981, 1982, and 1983 and the terms of the February 2008 Consent Order.

## C.    Discriminatory Effect

Even if this Court had failed to find discriminatory intent, the evidence also supports a finding of discriminatory effect. The Fifth Circuit has repeatedly held that the Fair Housing Act is violated by actions that have a discriminatory effect. *Cox v. City of Dallas, Texas*, 430 F.3d 734, 746 (5th Cir. 2005) ("the FHA . . . does not require proof of both discriminatory impact and intent"). The Fifth Circuit has not specifically addressed the actual test for discriminatory impact in the fair housing context after a plaintiff establishes disparate effect. In *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977)(hereinafter *Arlington II*), however, the Seventh Circuit articulated a four-factor test for disparate impact that has been widely used. 558 F.2d at 1290. A Court should consider:

> (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of Washington v. Davis ; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Id.* at 1290. The Seventh Circuit test ensures that finding a disparate racial impact is not deemed a per se violation of the Fair Housing Act. Rather, the test provides guidance to district courts, in their discretion, to determine whether a violation has occurred. *Id*. at 1290.

The Second Circuit's test, as stated in *Huntington Branch NAACP v. Town of*

*Huntington*, 844 F.2d 926, 938 (2d Cir.) *aff'd*, 488 U.S. 15 (1988), does not include any assessment of intent and is therefore slightly less rigorous than the *Arlington II* test.[8]  Although a sister court in this Circuit has relied on the standard announced in *Huntington*, this Court, in an abundance of caution, applies the more onerous standard which retains an intent element announced by the Seventh Circuit in *Arlington II* .  *See Dews v. Town of Sunnyvale, Texas,* 109 F. Supp. 2d. 526 (N.D. Texas 2000)(applying the analysis of *Huntington*).


1) strength of showing of disparate racial effect

As previously discussed, this Court has found that the moratorium would have a significant disparate racial effect.  Particularly with regard to the impact on income-qualified African-American households and families, as compared to Caucasian households and families, African-Americans are at least 25%, and for some income groups, 86% more likely to be impacted by the moratorium than their Caucasian counterparts.  (Tr. Mar. 11 Hr'g. 108.)

The strength of that effect is further supported by the rigor of Dr. Bradford's analysis. Statisticians test the likelihood of chance producing the same results that the moratorium produced by seeing if the analysis is "statistically significant."  (Tr. Mar. 11 Hr'g. 103.) Whether or not something is "significant" is assessed at different levels, such as 90%, 95%, and 99%.  (Id.)  In the analysis performed in this case, all of figures cited in this opinion were statistically significant at the 99% confidence level.  In plain language, this means that there is only a one percent likelihood that chance could have or would have produced the same type of disproportionate impact on African-Americans.  (Id.)

---

[8] The Supreme Court's affirming opinion did not address or "endorse" the proper test for assessing discriminatory impact.

(2) some evidence of discriminatory intent

As this Court discussed previously, several aspects of this case provide evidence of discriminatory intent, in particular the historical background of events, the sequence of events leading up to the decision, and the departure from normal zoning procedure. Even if such evidence is not sufficient to support a finding of the moratorium's overall discriminatory intent, the preponderance of the evidence indicates at a minimum "some" evidence of discriminatory intent.

(3) defendant's interest in the moratorium

The Court has painstakingly identified six possible justifications or interests on behalf of the defendants earlier in this opinion discussing whether the moratorium was a "substantive departure." For each, the Court assessed the factual support for the justification, based on the evidence produced by each party and the testimony at trial. The Court does not find any of the six proffered interests persuasive.

(4) relief sought by the plaintiff

More fully stated, "does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." *Arlington II*, 558 F.2d at 1290. This is clearly a case of the latter. In the Motion to Enforce, plaintiff does not seek an affirmative act from defendants. Rather, plaintiff and intervenor move this Court to rescind the moratorium such that Provident, a private developer, may proceed in the

development process for the affordable housing sites.

Based on the factual record and judged under a clear preponderance of the evidence, the Court finds that Ordinance # 905-09-08 has a discriminatory effect on African-Americans and therefore violates the Fair Housing Act, 42 U.S.C. §3604(a), and the terms of the February 2008 Consent Order.

## III. CONCLUSION

Accordingly,

IT IS ORDERED, that the Defendants St. Bernard Parish and St. Bernard Parish Council shall rescind Ordinance SBPC #905-09-98, its moratorium on all housing developments with five or more units.

IT IS FURTHER ORDERED, that the Defendants St. Bernard Parish and St. Bernard Parish Council shall be immediately enjoined from enforcing Ordinance SBPC #905-09-98, until such time as it is rescinded.

IT IS FURTHER ORDERED that Court shall entertain evidence of damages suffered by plaintiff and intervenor, including attorney fees, and whether defendants should be held in contempt of the February 27, 2008 Order of this Court upon motion of plaintiffs and a future hearing date.

New Orleans, Louisiana, this 25th day of March, 2009.

_____
**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**