# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**GREATER NEW ORLEANS FAIR HOUSING**      **CIVIL ACTION**
**ACTION CENTER, ET. AL.**

**VERSUS**                                  **NO:   06-7185**

**ST. BERNARD PARISH, ET AL.**          **SECTION: "C" (1)**

## ORDER AND REASONS

Before the Court is plaintiff Greater New Orleans Fair Housing Action Center's ("GNO") and intervenor Provident Realty Advisors, Inc.'s ("Provident") Motion to Enforce Consent Order (Rec. Doc. 241.)  Plaintiff and intervenor claim that defendants' recent conduct has wrongly prevented intervenor-plaintiff Provident Realty Advisors from moving forward on construction of four multi-family housing units and violated a previous Consent Order and Court Order in this case. Defendants oppose.  (Rec. Doc. 251.)  This Court held an evidentiary hearing on August 3, 2009[1], as the facts and conduct alleged in plaintiffs' current motion were sufficiently distinct from the facts previously presented to this Court in a prior evidentiary hearing.[2]  (Rec. Doc. 264, 291, 292.)  Based

---

[1] Evidence concluded on August 3, 2009.  On August 4, 2009, the Court dealt solely with scheduling post-trial briefs and the admissibility of specific exhibits.

[2] The Court deferred ruling on the admissibility of plaintiff's exhibit 30, which is a printout from defendants' own website.  Defendants objected to the exhibit as hearsay, lacking foundation, and prejudicial because it was not timely disclosed and incomplete.  Plaintiffs argued the exhibit was solely for impeachment and therefore disclosure was not required. Defendants declined the Court's invitation to supplement the record.  The Court finds the exhibit admissible as a party-opponent's own statement and that the defendants had an opportunity to address the exhibit when it was used to refresh Mr. Craig Taffaro's recollection. In addition, the admissibility is moot since this Court did not rely on the exhibit in this opinion.  Defendant's objection is denied and plaintiff's exhibit 30 is deemed admitted into the record.

on the evidence and testimony produced by the parties, the memoranda and arguments of counsel, the applicable law and the record in this case, the Court grants plaintiffs' Motion to Enforce the Consent Order for the following reasons.


I.      BACKGROUND

For the second time this year, this Court must assess whether defendants' conduct violates a previous Consent Order governing this case.  The parties to this matter entered into a Consent Order, which was approved by this Court on February 27, 2008.  (Rec. Doc. 114.)  The consent order settled plaintiffs' allegations that defendants violated the Fair Housing Act of 1968, 42 U.S.C. § 3601, and 42 U.S.C. §§ 1981-83 in enacting several housing ordinances.  The plaintiffs alleged that the ordinances were enacted with the intent and effect of discriminating against minorities and plaintiffs sought in particular a preliminary injunction to stay the operation of the so-called "blood relative ordinance."[3]  Pursuant to the terms of the injunctive relief section of the Consent Order, St. Bernard Parish was enjoined from

> violating the terms of the federal Fair Housing Act, and 42 U.S.C. §§ 1981, 1982, and 1983. Specifically, St. Bernard Parish agrees that it shall not:
>
> > A.   Refuse to rent a dwelling unit, or otherwise make unavailable or deny a dwelling unit, to any person because of race or national origin;
> > B.   Deny minority citizens the same rights as are enjoyed by white citizens to make and enforce contracts;
> > C.   Deny minority citizens the same rights as are enjoyed by white citizens to lease, hold and otherwise enjoy real property;
> > D.   Deny any person equal protection of the law by discriminating on the

---

[3] The parties refer to the "blood relative" ordinance as shorthand for a housing ordinance passed by the St. Bernard Parish Council on September 19, 2006, that stated: "No person . . .shall rent, lease, loan, or otherwise allow occupancy or use of any single-family residence located in an R-1 zone by any person or group of persons, other than a family member(s) related by blood within the first, second or third direct ascending or descending generation(s), without first obtaining a Permissive Use Permit from the St. Bernard Parish Council." (Rec. Doc. 114 at 2.)

basis of race and national origin in the leasing of real property; and,

E.   Retaliate against Plaintiffs or any other person who alleges that
Defendants have violated the Fair Housing Act, 42 U.S.C. § 3601 et seq.

(Rec. Doc. 114 at ¶ 9.)  GNO and St. Bernard Parish specifically agreed to the continuing

jurisdiction of this Court for a period of three years from February 27, 2008 to resolve disputes

regarding interpretation or compliance with the Consent Order.  (Id. at 8, ¶ 12.)

On December 18, 2008, GNO and Provident filed a motion to enforce the February 7,

2008 Consent Order. (Rec. Doc. 126.)  They claimed that an ordinance passed by the Council in

September 2008 violated the consent order entered in this case.  The challenged ordinance

placed a moratorium on the construction of all multi-family housing (i.e. buildings with more

than 5 units) for a period of twelve months or until the Council enacted certain zoning updates.

(Rec. Doc. 233.)

In March 2009, this Court heard two days of testimony regarding plaintiffs' challenge to

the September 2008 ordinance banning construction of multi-family housing as a violation of the

Fair Housing Act, 28 U.S.C. 1983, and the Consent Order previously entered in this matter.

(Rec. Doc. 226, 228.)  This Court found that the moratorium had a discriminatory intent and

effect and therefore constituted a violation of the Consent Order. *Greater New Orleans Fair*

*Housing Action Center v. St. Bernard Parish*, 2009 WL 2399999 (E.D.La. 2009)(Berrigan, J.)

Accordingly, this Court ordered the St. Bernard Parish Council to rescind the moratorium.  (Id.)

As part of this Court's March 2009 order to rescind the moratorium, this Court made a

series of factual findings on the underlying real estate developments at issue.

The proposed Provident developments consist of four mixed-income rental
apartment complexes with 72 units each.  Thirty percent of these units will be
rented at fair market rates. Fifty percent will be at 60% of Area Median Income

("AMI"). (Id.) Twenty percent will be at 30% of AMI. The estimated cost of the developments is $60 million dollars. The majority of funding for these complexes was specifically geared towards providing affordable housing, thus the income restrictions and lowered rent on 70% of the units. $20 million of the funding would come from Community Development Block Grant funds, administered by the Louisiana Recovery Development Program. $30 million would be provided in Low Income Housing Tax Credits. The final $10 million required to fund the developments was expected to come from a permanent loan from Freddie Mac.

(2009 WL 2399999 at 2)(internal citations omitted.) The Court adopts and incorporates these findings for the purposes of this opinion.

At issue in the present motion for contempt is whether defendants' conduct since the March 25, 2009 order constitutes a violation of the Consent Order. Plaintiffs allege that the Planning Commission's denial of their application to re-subdivide the relevant plats on April 23, 2009 has the same discriminatory intent and/or effect as the now-rescinded moratorium on construction of multi-family dwellings. (Rec. Doc. 241-2.) Plaintiffs also allege that subsequent actions by both the St. Bernard Parish Council and the Planning Commission injected improper and pretextual concerns into otherwise routine re-subdivision requests. (Id.) By improperly denying or delaying Provident's applications, plaintiffs allege that defendants are simply continuing the same course of conduct that this Court found previously violated the Consent Order. Defendants claim that any delay in the re-subdivision process arises from plaintiffs own unpreparedness and incomplete applications.

## II. LAW AND ANALYSIS

**A.      Disparate Racial Impact**

Central to determining both discriminatory intent and discriminatory effect is an

assessment of whether or not the challenged law has a disparate racial impact.  *See Overton v.*

*City of Austin*,  871 F.2d 529, 540 (5th Cir. 1989)(describing standard for discriminatory intent);

*Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996)(noting discriminatory effect

under the FHA may be proven with evidence of a "significantly greater discriminatory impact.")

This Court previously heard testimony from plaintiffs' and defendants' experts as to

whether or not the moratorium had a disparate impact on African-Americans.  After reviewing

the evidence and the applicable law regarding disparate impact, this Court found that the

moratorium then at issue had a disparate impact on African-Americans.

At this hearing, neither party introduced new evidence regarding disparate impact.

Plaintiffs submitted the March evidentiary hearing testimony of their expert, Dr. Calvin

Bradford, as an exhibit.  (Pltf. Ex. 21.)  Defendants also did not submit any additional evidence,

despite this Court's previous rejection of the methods used by defendant's previous expert, Dr.

Wade Ragas.  Accordingly, the sole evidence before this Court as to disparate impact is found in

the record of the March evidentiary hearing.

Upon review of this Court's March 25, 2009 Order, these findings are sufficient to

demonstrate that acts that prevent the realization of Provident's proposed development would

also have a racially disparate impact.   First, because African-American households are twice as

likely as Caucasians to live in rental housing in the greater New Orleans metropolitan area,

significantly reducing the number of rental properties available in St. Bernard Parish

disproportionately affects African-Americans. 2009 WL 2399999 at 3.  Second,

African-American families are more than three times as likely as Caucasian families to have incomes within the lowest income range served by the affordable housing developments (30% of AMI). *Id.* In the higher income range (60% of AMI), African-American families are 87% more likely to have incomes within this next highest income range than Caucasian families. *Id.* Third, testimony at the March evidentiary hearing indicated that based on the developer's experience and current leasing of similar mixed-income units in Louisiana on the Northshore and in Texas, Provident would expect the rental population to be approximately 50% African-American, 25% other minority, and 25% Caucasian. *Id.* at 4.

Based on the above findings, the Court finds that acts to prevent the proposed Provident developments would have a disparate racial impact on African-Americans.


B.      **Discriminatory Intent**

To assess whether or not discriminatory intent exists, the Fifth Circuit, citing the Supreme Court, has held the following circumstantial evidence factors to be both pertinent and non-exhaustive: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989)(*citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)). In short, plaintiff and intervenor must establish "that race was a consideration and played some role in the real estate transaction." *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986).

<u>(1) the historical background of the decision</u>

This Court extensively summarized the historical background in this case in its March 25, 2009 and hereby adopts and incorporates those findings here. 2009 WL 2399999 at 4-5.

The Court also notes the continuing and prominent involvement of St. Bernard Parish President Craig Taffaro and St. Bernard Parish Councilmember Wayne Landry in their opposition to the Provident developments. The conduct of Mr. Taffaro and Mr. Landry in opposing the Provident developments both before and after this Court's March 2009 order is noteworthy - but only to the extent that their opposition reflects a continuing course of conduct based on the same justifications that this Court previously found to be pretextual.

As this Court previously noted, then Councilperson Craig Taffaro had introduced previous ordinances relating to rentals and multi-family units, including the "blood relative"ordinance. *Id*. As St. Bernard Parish President, he testified he had no reason to use his veto power to reject the moratorium that this Court subsequently found violated the Consent Order. *Id*. In the scant four months since this Court issued its opinion regarding the 2008 moratorium, Mr. Taffaro has twice addressed the Provident developments in his column to constituents, "Craig's Corner." On March 30, 2009, in a thinly veiled reference to the mixed-income developments at issue, Mr. Taffaro wrote ". . . but when the push to disrupt the investment of neighborhoods through allowing blight, an overabundance of rental properties, and a lack of personal accountability for one's area becomes the focus, it is murderous to our Recovery." (Rec. Doc. 241-36.) On May 5, 2009, Mr. Taffaro analogized the current dispute as a game of high-stakes poker, with St. Bernard residents and their "commitment to [their] way of life" on one side and the developers "with their federal court ruling" on the other. (Rec. Doc.

241-23.)  In addition, Mr. Taffaro acknowledges that he has urged the Louisiana Housing Finance Authority (LHFA) to re-examine the basis for their award of tax credits to Provident to support the construction of affordable housing in St. Bernard Parish.  (Tr. Evd. Hr'g, Aug. 3, 2009, at 166)("Tr. Evd. Hr'g")[4]  The Court has previously found these reasons - surplus and availability of rental housing and quality of life issues - to be pretextual in this specific context. 2009 WL 2399999 at 9-10.  In short, as Mr. Taffaro testified, he continues to disagree with this Court's March 25, 2009 ruling and feels it is his duty to continue to oppose the developments through any legal means possible.  (Id. at 177)

Councilperson Wayne Landry also continues to oppose the developments. This Court noted that the basis for Mr. Landry's November 12, 2008 letter to the LHFA opposing the award of tax credits, lack of infrastructure, was directly contradicted by an earlier letter to the same agency by Mr. Taffaro.  (Rec. Doc. 233 at 17.)  Mr. Landry also participated in the meeting with the LHFA and Mr. Taffaro regarding the basis for the award of tax credits to Provident.  Mr. Landry signed an online petition, albeit in his personal capacity, opposing the Provident developments.  (Tr. Evd. Hr'g at 238.)  At the hearing, Mr. Landry emphasized that he opposed the developments on economic grounds, including the lowering of property values in the parish. (Tr. Evd. Hr'g at 298.)  He also testified that he opposes the developments because he believes that St. Bernard Parish has sufficient affordable housing available, a justification this Court previously found to be pretextual.  (Id. at 269-270.)


(2) the specific sequence of events leading up to the decision

---

[4] The Court notes that the evidentiary hearing transcript cited in this opinion is a rough transcript provided to the Court by the court reporter.  Accordingly, all citations are approximate.

In March and April 2009, the record reflects a rather harmonious working relationship between the staff of the Department of Community Development of St. Bernard Parish and Provident regarding the re-subdivision of the properties to be used for the four housing units. Correspondence between Mary Chimento, Assistant Director of Community Development, and Matt Harris, Provident's representative, reflects a concerted effort by both sides to respond to queries and move the application process forward. (*See e.g.*, Def. Ex. 6.) Leading up to the public hearing on Provident's applications, Provident claims that Ms. Chimento specifically told Provident that its applications were considered minor subdivisions. In addition, the only material requested by Parish staff prior to the hearing were those items typical of a minor re-subdivision, i.e. letters of no objection from the Sewer and Water Board, Public Works, and the State Health Department if applicable. (See e.g., Def. Ex. 6-50.) Mr. Jerry Graves, Director of Community Development for St. Bernard Parish, even agreed at the evidentiary hearing that Provident's applications were "on track" right up to the April 28, 2009 Planning Commission meeting. In fact, the professional staff at the Department of Community Development had recommended "final approval" of three of the four re-subdivision applications and "tentative" approval of the fourth, so long as easily met conditions were provided by Provident. (Rec. Doc. 241-27.)

On April 27, 2009, the day before the Commission meeting, St. Bernard Parish President Taffaro issued a specific notice to St. Bernard citizens that there was a public hearing on the "proposed four multi-family mixed-income housing developments" before the Planning Commission the following day. (Rec. Doc. 241-16.) Although other re-subdivision applications were also on the agenda, none of those applications were specifically listed in Mr. Taffaro's notice. (Def. Ex. 5 at 1.)

On April 28, 2009, several hundred people attended, virtually all opposed, and following the hearing, the Planning Commission denied Provident's applications to record re-subdivisions in the purchased land.  Plaintiffs claim that they were ambushed at the hearing by the Commissioners with questions irrelevant to a minor re-subdivision application, including questions on traffic, drainage, and crime.  Plaintiffs argue this was particularly surprising because none of these concerns had been raised by the staff in the initial vetting of their applications.

At the hearing, and prior to the vote by the Commission, many of the public and official comments included language this Court has previously found to be "camouflaged racial expressions."  For example, this Court has previously found references to Village Square, given the demographics of the predominantly African-American housing development in a largely Caucasian parish, to be "racially loaded."  2009 WL 2399999 at 6.  Yet members of the public repeatedly compared the developments to Village Square.  For example, one person complained that "now we're going to have four Village Squares" in describing Provident's four proposed multi-family developments  (Tr. Planning Comm Hr'g, April 28, 2009, Rec. Doc. 241-36 at 25.) Another stated that "we had enough problems with Village Square." (Tr. Planning Comm Hr'g, April 28, 2009, Rec. Doc. 251-3 at 30.)

An influx of crime was repeatedly cited by both the public and members of the Planning Commission during the public hearing.  For example, a member of the public requested the Planning Commission require plaintiffs to provide an impact study on crime as a result of the developments and the low-income residents.  (Tr. Planning Comm Hr'g, April 28, 2009, Rec. Doc. 241-36 at 25-26.)   Another resident opposed to the developments warned in a petition advertising the hearing,  "the criminal element is spilling over into our beautiful parish!"  (Id. at

10

14.) One of the Commissioners, Mr. Williams, specifically agreed with the public concerns about crime as a result of the Provident developments during the April 28, 2009 hearing and stated "apartments draw criminals." (Id. at 26.) Another Commissioner questioned whether the Provident developments would feature on-site security and whether security would be present 24 hours a day. (Id. at 40.)

Many of the comments referenced how "different" the residents of the development would be. A member of the public characterized the future residents as people who "are going to sit in the yard or on the balcony all day with the music up, screaming at their neighbors, dealing drugs" and compared the developments to living in New Orleans East, which is predominantly African-American. (Id. at 28-29.) Another member of the public complained that more "renters" in the parish would threaten the "similar values" and shared "value system" that drew homeowners back home after Hurricane Katrina. (Tr. Planning Comm Hr'g, April 28, 2009, Rec. Doc. 251-3 at 41.) These types of comments are reminiscent of comments by President Taffaro and others about preserving our "way of life" and "shared values." There were also explicit references to race. One resident noted that he has a "polite" "black family living nearby" that doesn't play "their music." (Id. at 34.) The same resident does, however, have "a problem with someone that's going to be coming up the street, gang-banging somebody or they're kicking the door down every couple of days." (Id.)

These types of comments were repeated in public hearings at the Parish Council meeting on May 19, 2009, which remanded the applications back to the Planning Commission; the Planning Commission meeting on June 23, 2009, which tabled the applications pending submission of additional documents; and the July 13, 2009 public informational meeting on the developments. At the May 19, 2009 meeting, one resident opposed the development because of

the "hardcore crime that we will no doubt be subjected to because of these apartments." (Rec. Doc. 241-34 at 18.)   At the June 23, 2009 meeting, a member of the public and a Commissioner discussed the Black Panthers.  A resident described how the Black Panthers had previously taken over housing projects to facilitate crime to justify his opposition to the developments.  (Tr. Planning Comm Hr'g, June 23, 2009, Item 2-C Re-subdivision at 20, Def. Ex. 4)  Asked by a Planning Commissioner to elaborate on the topic of the Black Panthers, the resident described how "militant" "black men" would firebomb Orleans parish housing developments.  (Id. at 22.)

As this Court has previously found, the references to "crime," "blight," and "quality of life" are similar to the types of expressions that courts in similar situations have found to be nothing more than "camouflaged racial expressions."  *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (affirming that statements about "undesirables," and concerns about personal safety due to "new" people are "camouflaged racial expressions"); *Atkins v. Robinson*, 545 F. Supp. 852, 871-72 (E.D. Va. 1982) (finding statement that she "feared the projects 'would degenerate to slum-like conditions, with an abundance of crime" to be a veiled reference to race); *see also Doe v. Village of Mamaroneck*, 462 F.Supp.2d 520 (S.D.N.Y. 2006.)(finding "quality of life" concern pretextual for racial animus in harassment of day laborers.).

Even though the public statements do not themselves "constitute state action for purposes of the Fourteenth Amendment," the statements may still be relevant in equal protection analysis. *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 194-195 (2003).  In this case, the public statements are relevant both as expressing the general sentiment during the decision making process and also insofar as public opinion was specifically referenced by the decision-makers themselves.  For example, Earl Dauterive, Chair of the Planning Commission, stated prior to voting against the applications in April that he was against

12

the applications for a "variety of reasons," one of the "most obvious is, of course, the health and welfare of the St. Bernard Parish as everybody who came up and spoke about it." (Tr. Evd. Hr'g at 353.) During his testimony, Mr. Dauterive testified that public opinion was one of the reasons supporting his decision and that public opposition to developments was related to concerns of "crime," "Section 8," and "Village Square." (Tr. Evd. Hr'g at 352.)

Immediately after the April 28, 2009 Commission denial of Provident's applications, Councilmember Wayne Landry testified that he had discussed the Commission's decision with the other six council members and decided that the Council would take the Commission's side if Provident appealed the Commission's decision. (Tr. Evd. Hr'g at 247-248; see also Rec. Doc. 241-17.) Mr. Landry's statement was before an appeal had been filed and before Provident had an opportunity to present its arguments.

Plaintiffs sought to appeal the Planning Commission's decision. The record reflects correspondence with St. Bernard Parish employees on the appeal process on May 1, 2009. (See e.g., Rec. Doc. 241-36 at 54.) Despite multiple requests, plaintiffs only received a letter stating the reasons for the denial from the Department of Community Development on May 18, 2009, one day before the scheduled hearing. (Rec. Doc. 241-33.)

At the May 19, 2009 hearing, the Parish Council, without Councilmember objection, sent Provident's applications back to the Planning Commission for further consideration. Following the May hearing, Mr. Landry stated that the Council's decision actually upheld the Planning Commission without "pulling any exposure for a judge to say we acted unjust." (Tr. Evd. Hr'g at 254.)

The Planning Commission revisited Provident's applications during another public hearing held on June 23, 2009. The Commission voted to table the applications pending

submission of additional documents, including a sufficiently detailed traffic study.

The Court is troubled by the sudden and abrupt change in the treatment of Provident's applications beginning with the April 28, 2009 hearing. Moreover, there appears to be a concerted effort, through stall and delay tactics, to simply outlast Provident's efforts while avoiding a substantive decision on their application. Provident's representative testified that construction must be completed by December 31, 2010 for the tax credits to be viable. (Tr. Evd. Hr'g at 21.) By delaying construction a month here and a month there while plaintiffs ping-pong back and forth between the Planning Commission and the Parish Council, defendants may well achieve their goal.

(3) departures from the normal procedural sequence

Provident's applications for re-subdivision of the four properties appeared to be routine, recommended by staff for final or tentative approval, and on track for Commission approval. Following the public Planning Commission hearing, specifically advertised by Parish President Taffaro, the Commission - against the recommendations of its professional staff - voted to deny Provident's applications.

Under state law, when the Planning Commission votes to deny a re-subdivision application, the grounds for the denial must be stated on the record. LSA-R.S. 33:113 ("The ground of disapproval of any plat shall be stated upon the records of such commission.") Following denial of their applications on April 28, plaintiffs immediately and repeatedly requested a statement of reasons for the denial so they could address those reasons in their appeal to the Parish Council. (Rec. Doc. 241-18; 241-36 at 51.) On May 18, the day before their appeal was scheduled to be heard and only two business days after Provident was notified that the

Council had agreed to hear the appeal, Jerry Graves issued a letter that purportedly lists the reasons for the denial. (Rec. Doc. 241-31; Rec. Doc. 241-33.) Mr. Graves wrote that the "St. Bernard Parish Planning Commission has denied your application for resubdivision at this time. There were several issues raised at the meeting, including but not limited to, drainage, wetlands, and traffic, your representative was either unable or unwilling to address." (Rec. Doc. 241-33)(emphasis added). However, at the evidentiary hearing, the Chair of the Planning Commission, Earl Dauterive, stated that he had never seen the letter before and that the letter did not speak for the Planning Commission. (Tr. Evd. Hr'g at 349-350.) Mr. Dauterive stated that he couldn't answer for the other members of the commission and that he could only speak for why he in particular voted to deny the applications. (Id.) Even if Mr. Graves' letter did constitute an official communication by the Planning Commission, it still does not comply with the law because it fails to specify the exact reasons for the denial. Instead, the letter leaves the door open for future denials based on issues that the plaintiffs may or may not have prior notice of.

Plaintiffs also challenge the Parish Council's handling of their appeal as a departure from the normal procedural process. First, plaintiffs claim that they were not given an adequate chance to speak and address the council. As demonstrated by the transcript and the video, plaintiffs' counsel spoke for approximately 8 minutes, including repeated interruptions by both the audience and by Councilmember Wayne Landry, who presided over the meeting. (Rec. Doc. 241-34 (transcript); Rec. Doc. 251-7 (video)) Although defendants argue that plaintiffs' counsel exceeded the time limit for speakers, the video submitted by defendants shows that for later agenda items, another speaker was given approximately seven and a half minutes to opine against another proposed rental unit without interruption. (*Compare* Rec. Doc. 251-7 at 39:45 to

48:10 for plaintiffs counsel with Rec. Doc. 251-7 at 1:10 to 1:17 for another speaker.)

The Court is less persuaded by plaintiffs' second claim. Plaintiffs argue that the Parish Council did not actually vote as required on their appeal and therefore constitutes a procedural departure. At the beginning of the Parish Council meeting, Mr. Landry offered to entertain a motion to proceed in executive session to discuss the "GNOFHAC et al. v. St. Bernard Parish Government, USDC 2:06-cv-7185 " matter.[5] Upon return from executive session and after a few additional items, Mr. Landry stated that while he would like to vote to uphold the Planning Commission's vote, he thought it was best for the Planning Commission to address the outstanding issues first. (Rec. Doc. 241-34 at 3.) Provident's appeal was sent back to the Planning Commission without Councilmember objection. (Rec. Doc. 241-34 at 4.) Although there was not a formal vote on the matter, the Council did take action on the appeal and no objections were raised by Councilmembers.

(4) substantive departures

"Substantive departures" are usually indicated when "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights*, 429 U.S. at 267.

As previously discussed, St. Bernard Parish officials recognized significant beneficial aspects of the proposed development, including the economic investment of $60 million dollars in their parish and the estimated annual $40,000 tax revenues. 2009 WL 2399999 at 9. In

---

[5] The Court finds it interesting that the matter listed was not by applicant or property name as in the agenda, but rather by court case and civil action number. Later, the actual applicants and property were described.

addition, the developments could provide much needed housing to support St. Bernard's continuing economic recovery. Defendants' latest version of justifications lack factual support and are undermined by the initial treatment of Provident's re-subdivision applications by the Planning Commission's staff.

*Justification #1 - Provident failed to comply with requirements*

A key question in assessing defendant's justification that plaintiffs failed to comply with the relevant regulations is whether or not Provident's application was classified as a major or minor re-subdivision. Plaintiffs claim that they were instructed by Ms. Chimento that their applications would be considered as a "minor re-subdivision." (Tr. Evd. Hr'g at 17.). Mr. Jerry Graves, Director of Community Development for St. Bernard Parish and Secretary of the Planning and Zoning Commision, is Ms. Chimento's direct supervisor. He testified that he had discussed the matter with Ms. Chimento and was not sure if Provident's application had ever been specified as major or minor.[6] (Tr. Evd. Hr'g at 304.) Second, he testified that the applications, because of the size of the property, could be considered major re-subdivisions. (Id. at 305) Third, he claimed that the provisions of Section 2.5 of the Subdivision Regulations were also binding on Provident's applications. (Id.)

Under the regulations, the staff of the Planning and Zoning Commission work with applicants to prepare their applications, including discussion of the "submission requirements." (Def. Ex. 1 at App. A § 2.1; Tr. Evd. Hr'g at 303-304). One issue to be vetted early on in the application process is whether a plan is classified as a minor or major re-subdivision. (Tr. Evd.

---

[6] Neither party called Ms. Chimento as a witness.

Hr'g at 304.)  This determination shall be communicated to the applicant.  (Def. Ex. 1 at App. A. § 2.1 (stating "[t]he applicant shall be directed at this time by the staff as to the proper procedure for submission based upon the plan's classification as a major or minor subdivision, or a re-subdivision. . ." (emphasis added)).   The Court finds Mr. Graves' testimony that he is unsure if the Provident applications were ever classified confusing at best and disingenous.  The staff acts as a technical resource to the Commission, discusses submission with applicants, and provides some sort of screening function through their role in recommending whether or not an application should be approved.  (*See e.g.*, Rec. Doc. 241-27 (recommending approval of Provident application.)) To fail to classify an application could result in placing obviously deficient applications before the Planning Commission, a waste of the staff and the Commission's limited resources.   Failing to classify an application also undermines the legislative requirement that the staff discuss the submission requirements with an applicant.

Whether or not an application is treated as a major or minor re-subdivision has implications for the types of documents required in a re-subdivision application.  The regulations define a minor subdivision as "[a]ny subdivision containing not more than three (3) lots fronting on an existing street."  (Id. at § 4.1.)  A major subdivision is "all subdivisions not classified as minor subdivisions of four (4) or more lots or any size subdivision requiring any new street or extension of parish facilities."  (Id.)  If an application is classified as a major re-subdivision, the regulations require submission of "evidence that a wetland determination submission from the U.S. Army Corps of Engineers has been initiated;" "a drainage impact study;" and "an LPDES [Louisiana Pollutant Discharge Elimination System] permit from the Louisiana Department of Environmental Quality for the storm water discharge."  (Id. at § 2.2.)  In addition, "[t]he parish engineer and/or community development director may require as part of submission the

completion of a traffic impact study." (Id.)  In contrast, minor re-subdivision application requirements are spelled out on the one-page application: letters of approval from the St. Bernard Parish Water and Sewerage, the Louisiana State Board of Health if septic tanks or sewer treatment plants are to be used, and the St. Bernard Parish Public Works Director; recorded copy of property titles; and 30 copies of the property survey.  (*See* Rec. Doc. 241-4.)  Neither party disputes that if one looks solely at the number of lots, Provident's applications would be considered a minor re-subdivision since they affect less than three lots.  (Tr. Evd. Hr'g at 305.)

The Court finds plaintiffs' testimony that their applications were, at least initially, classified as a minor re-subdivision more credible for the following reasons.  First, the Department of Community Development is specifically tasked with working with applicants and specifying the requirements.  In this case, the staff only requested those items that are typical of a minor re-subdivision application - such as letters from Public Works and Water and Sewerage - prior to placing the application on the Commission's agenda.   Although some of the requirements for a major re-subdivision are discretionary, such as a traffic study, many are not, such as a drainage impact study.  The first request for studies on traffic, wetlands, and drainage arose not from staff during the application process, but rather at the Planning and Zoning Commission hearing on April 28, 2009.[7]  The fact that the applications were initially considered to be minor, but were subsequently treated differently at the April 28, 2009 hearing is similar to Provident's earlier experiences with the Parish, where an initially cooperative relationship stands in contrast to later developments.

Defendant's argument that plaintiff failed to comply with the governing regulations is

---

[7] The Court also notes that under the governing regulations, it is within the parish engineer's purview to request a traffic study and no such request was made in this case.  (Tr. Evd. Hr'g at 342.)

also undermined by the recommendations of the staff of the Planning Commission. For three of the four applications, the staff recommended "final approval" by the Commission.[8] (Rec. Doc. 241-27.) For the fourth, the staff recommended "tentative approval" pending Provident's completion of certain utility extensions. (Id.) Indeed, Mr. Graves told the Commission that their concerns were not usually addressed during the re-subdivision process. (Tr. Evd. Hr'g at 308.) Even at the June 23, 2009 Planning Commission hearing, the staff - instead of recommending denial of the applications - simply decided not to make a recommendation at all.

Defendants also argue that their questions and requirements regarding traffic, wetlands, and drainage were appropriate because the provisions of Section 2.5 regarding non-residential subdivisions were binding. The land at issue is zoned for commercial use, which under St. Bernard regulations, also allows for construction of multi-family units. Section 2.5 provides that applicants must address traffic issues and that the Planning Commission and Parish Engineer may impose additional standards as required, such as drainage and utilities. (Def. Ex. 1 at App. A. § 2.5.) First, Mr. Graves conceded that plaintiffs had never been informed that Section 2.5 applied to their applications. This is fatal to defendants' argument given the application process and legislative directive that staff discuss submission requirements with the applicant. The fact that plaintiffs were admittedly never informed their application was subject to a different review standard certainly allows for the possibility that Section 2.5 was applied *post facto*. Moreover, it is not clear that Section 2.5 actually applies. The text of Section 2.5 states that the section applies if a "proposed subdivision includes land that is zoned for commercial or industrial purposes." (Def. Ex. 1 at App. A. § 2.5.) The regulations later define a "non-residential

---

[8]Although Mr. Graves initially attempted to portray the April recommendations by staff as purely recommending approval for placement on the Commission agenda, he later conceded that in fact the staff had recommended approval of the application itself. (Tr. Evd. Hr'g at 306.)

subdivision" as "a subdivision whose intended use is other than residential, such as commercial or industrial." (Id. at § 4.1) Provident's purpose for the land has consistently been for multi-family residential use.

The Court is also disturbed by the Planning Commission staff's sudden reversal of position absent any significant change in Provident's application. Prior to the April 28, 2009 hearing, the staff had recommended that all four re-subdivision applications be approved. (Rec. Doc. 241-27.) Prior to the June 23, 2009 Planning Commission hearing, however, the staff had rescinded their earlier recommendations and instead did not take a position on whether or not the applications should be approved or denied. (Tr. Evd. Hr'g at 320-321.) Mr. Graves testified that the lack of a recommendation in June was based on the insufficiency of the traffic study requested by the Commission and provided by plaintiffs. (Id.) If that were the case, however, why not recommend denial if the application was deficient?

The Court finds that Provident's applications were initially considered minor re-subdivisions, but were subsequently - and without notice to Provident - treated by the Planning and Zoning Commission and staff as a major re-subdivision. As such, the abrupt change in the treatment of Provident's application constitutes a substantive departure.

*Justification #2 - Affordable housing not needed*

Defendants claim that there is sufficient affordable housing in the area to meet demand, but failed to present any evidence or documentation of their belief. In March 2009, defendants, including Councilperson Landry, used the same argument to justify their opposition to the Provident developments. 2009 WL 2399999 at 9. This Court concluded that given the employment and housing trends in St. Bernard Parish economic development, a continued need

for affordable housing exists to support that development. *Id.* Although the Court had previously discounted the methodology employed by defendants' proffered expert in March, defendants were free to present new, emerging, or additional evidence to support their stated belief that the stock of affordable housing in St. Bernard Parish is sufficient. The only evidence presented by defendants was anecdotal and did not present a comprehensive picture of the affordable housing market in St. Bernard Parish or the greater metropolitan region. (*See e.g.*, Tr. Evd. Hr'g at 294 (Wayne Landry testifying that there's "plenty" of houses to own and rent in the parish.)

The testimony at this evidentiary hearing suggested that St. Bernard Parish is continuing to attract new investment, leading to more jobs and an increased need for affordable housing. Wal-Mart and Lowe's, two large "box" stores, are opening locations in the parish in the near future. (Tr. Evd. Hr'g at 199.) In addition, almost a billion dollars of public assistance and construction projects are in the pipeline for St. Bernard Parish. (Id.; *see also* 2009 WL 2399999 at 9) All of these new investments and projects will require additional low wage employees, many of whom will need housing in St. Bernard Parish.

In addition, the need for affordable housing in St. Bernard Parish is expected to increase. The temporary disaster housing assistance program (DHAP) ends August 31. (Tr. Evd. Hr'g at 198.) According to plaintiff's expert, Kalima Rose, who reviewed the latest state statistics, only 40% of DHAP families in St. Bernard Parish are expected to qualify for Section 8 assistance. (Id. at 199.) The remainder, approximately 650 families, will need access to affordable housing in the parish. (Id.) More broadly, Ms. Rose also testified that rental rates in the region continue to increase while income in St. Bernard Parish declines. (Id.)

Moreover, defendants failed to demonstrate how the availability or lack of affordable

housing is relevant to the re-subdivision process. Re-subdivision is a government process that records the sale and ownership of smaller tracts from a larger tract. (Tr. Evd. Hr'g at 13.) It is literally a mapping of changed plat lines. (Def. Ex. 2, App. A § 4.1)(defining re-subdivision as a "change in a map of an approved or recorded subdivision plat.") Even the application requirements for a major re-subdivision do not address the purpose for which the land is to be used. The purpose or use of the land is usually handled in the zoning process.[9] (Tr. Evd. Hr'g at 316-317.)

Nevertheless, the Planning Commission - in evaluating and hearing Provident's re-subdivision application - addressed many of its comments to the use of the land, instead of the requirements for a re-subdivision application. Earl Dauterive, Chair of the Planning Commission, actually stated that what plaintiffs intended to build on the property was part of the subdivision process. (Tr. Planning Comm. Hr'g, April 28, 2009, Rec. Doc. 241-36 at 19.) At the June 23, 2009 hearing another Commissioner stated that until he had additional information cited by the plaintiff on the need for affordable housing in St. Bernard Parish, that he would be unable to make a decision on Provident's re-subdivision application. (Tr. Planning Comm. Hr'g, June 23, 2009, Pltfs. Ex. 2 at 169.)

The Commissioners also took the public's comments into account in their decision to deny the re-subdivision applications. At the May 19 Parish Council meeting, Earl Dauterive, Chair of the Planning Commission, rhetorically asked, "How could they ask for an answer of why it was a denial? He must not have been in the room because it was very evident from the public opinion as well as all the questions that were asked not have been [sic] answered." (Tr.

_____

[9] The Court also notes that proposed land is already properly zoned for the construction of multifamily units. (Tr. Evd. Hr'g 316; see also Pltfs. Ex. 126-11 at 2.) Accordingly, as a matter of right, the owner is allowed to construct multi-family units on the property. (Tr. Evd. Hr'g 316.)

Evd. Hr'g at 351-2.)  Mr. Dauterive also acknowledged that one of his concerns in denying the application was public opinions expressed at the meeting, including crime, Section 8, and Village Square.  (Id. at 352.)

*Justification #3 - Economics and lowering of property values*

Last, defendants claim they oppose the Provident developments because the developments threaten property values and the broader economic recovery of St. Bernard Parish. Councilperson Landry testified that as a result of the developments, resident's housing values would decline and would actually result in an overall decrease to the parish's tax revenue.  (Tr. Evd. Hr'g at 298.)  However, he failed to present any evidence, data, or indicators that the developments at issue would a) lower property values in the area and b) have such an impact as to decrease the overall tax revenue to the parish.  In addition, similar to the prior justification, whether or not the developments would have such an impact is beyond the re-subdivision process.  The fact that these are the reasons cited for the treatment of Provident's applications itself suggests that the re-subdivision process is being subverted to account for extraneous concerns.

None of the three justifications, individually or collectively, are persuasive as legitimate reasons for the St. Bernard Parish government's treatment of Provident's re-subdivision applications.  Accordingly, the Court concludes that the denial and delaying of Provident's re-subdivision applications is a "substantive departure" from normal decision-making.

(5) legislative history

Several members of the Planning Commission stated that their treatment of Provident's applications was based in part on public opinion, concerns about the use or purpose of the land, and crime. *See supra* II.B.2 and II.B.4. This Court has found these concerns either irrelevant to the minor re-subdivision applications at issue or improper as "racially camouflaged expressions." *Id*.

Based on all of the evidence discussed above, the Court concludes that the Parish and Council's intent in subverting the re-subdivision application process is and was racially discriminatory, and as such defendants have violated the Fair Housing Act, 42 U.S.C. §3604(a), 42 U.S.C. §§ 1981, 1982, and 1983 and the terms of the February 2008 Consent Order.

## C. Discriminatory Effect

Even if this Court had failed to find discriminatory intent, the evidence also supports a finding of discriminatory effect. The Fifth Circuit has repeatedly held that the Fair Housing Act is violated by actions that have a discriminatory effect. *Cox v. City of Dallas, Texas*, 430 F.3d 734, 746 (5th Cir. 2005) ("the FHA . . . does not require proof of both discriminatory impact and intent"). The Fifth Circuit has not specifically addressed the actual test for discriminatory impact in the fair housing context after a plaintiff establishes disparate effect. In *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977)(hereinafter *Arlington II*), however, the Seventh Circuit articulated a four-factor test for disparate impact that has been widely used. 558 F.2d at 1290. A Court should consider:

> (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis* ; (3) what is the defendant's

> interest in taking the action complained of; and (4) does the plaintiff seek to
> compel the defendant to affirmatively provide housing for members of minority
> groups or merely to restrain the defendant from interfering with individual
> property owners who wish to provide such housing.

*Id.* at 1290.  The Seventh Circuit test ensures that finding a disparate racial impact is not deemed

a *per se* violation of the Fair Housing Act.  Rather, the test provides guidance to district courts,

in their discretion, to determine whether a violation has occurred.  *Id*. at 1290.

The Second Circuit's test, as stated in *Huntington Branch NAACP v. Town of*

*Huntington*, 844 F.2d 926, 938 (2d Cir.) *aff'd*, 488 U.S. 15 (1988), does not include any

assessment of intent and is therefore slightly less rigorous than the *Arlington II* test.[10]  Although

a sister court in this Circuit has relied on the standard announced in *Huntington*, this Court, in an

abundance of caution, applies the more onerous standard which retains an intent element

announced by the Seventh Circuit in *Arlington II* .  *See Dews v. Town of Sunnyvale, Texas,* 109

F. Supp. 2d. 526 (N.D. Texas 2000)(applying the analysis of *Huntington*).

1) strength of showing of disparate racial effect

As previously discussed, this Court has found that preventing the Provident

developments would have a significant disparate racial effect.  Particularly with regard to the

impact on income-qualified African-American households and families, as compared to

Caucasian households and families, African-Americans are at least 25%, and for some income

groups, 86% more likely to be impacted than their Caucasian counterparts.  (Tr. Mar. 11 Hr'g.

108.)

As this Court has previously noted,

---

[10] The Supreme Court's affirming opinion did not address or "endorse" the proper test for assessing discriminatory impact.

The strength of that effect is further supported by the rigor of Dr. Bradford's analysis. Statisticians test the likelihood of chance producing the same results that the moratorium produced by seeing if the analysis is "statistically significant." (Tr. Mar. 11 Hr'g. 103.) Whether or not something is "significant" is assessed at different levels, such as 90%, 95%, and 99%. (Id.) In the analysis performed in this case, all of the figures cited in this opinion were statistically significant at the 99% confidence level. In plain language, this means that there is only a one percent likelihood that chance could have or would have produced the same type of disproportionate impact on African-Americans. (Id.)

2009 WL 2399999 at 13.

(2) some evidence of discriminatory intent

As this Court discussed previously, several aspects of this case provide evidence of discriminatory intent, in particular the historical background of events, the sequence of events leading up to the decision, the substantive departures, and the departure from normal procedures. Even if such evidence is not sufficient to support a finding of the moratorium's overall discriminatory intent, the preponderance of the evidence indicates at a minimum "some" evidence of discriminatory intent.

(3) defendant's interest in preventing the developments

The Court has identified three possible justifications or interests on behalf of the defendants earlier in this opinion discussing whether the decisions by the Planning and Zoning Commission and the Parish Council constituted "substantive departures." For each, the Court assessed the factual support for the justification, based on the evidence produced by each party and the testimony at trial. The Court does not find any of the proffered interests persuasive.

<u>(4) relief sought by the plaintiff</u>

The Court is required to consider whether plaintiffs "seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." *Arlington II*, 558 F.2d at 1290. Plaintiffs' motion requests damages and costs resulting from defendant's alleged violation of the Consent Order. In their motion and at the hearing, plaintiffs did not request an affirmative order from this Court regarding the next steps in the Planning Commission's consideration of Provident's application.[11] Instead, by seeking damages, plaintiffs seek to attach a cost to defendants' actions and deter future violations.

Based on the factual record and judged under a clear preponderance of the evidence, the Court finds that defendants' conduct since March 25, 2009, by subverting the re-subdivision process, has a discriminatory effect on African-Americans and therefore violates the Fair Housing Act, 42 U.S.C. §3604(a), and the terms of the February 2008 Consent Order.

## III.    CONTEMPT

A "movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Whitcraft v. Brown*, 2009 WL 1492833, 2 (5th Cir. 2009)(citing *Martin v. Trinity Indus., Inc.*, 959 F.2d

---

[11] The Court notes that plaintiffs' post-trial memorandum seeks an order from this Court for defendants to approve the re-subdivision applications. As this was not requested in plaintiffs' motion, this request is procedurally deficient and not properly before the Court. Moreover, the basis for the Court's authority to do so has not been briefed by either party. As such, the Court relies on the relief requested by the plaintiffs as stated in its motion for contempt and accompanying memorandum.

45, 47 (5th Cir.1992).

The analysis and findings contained in this opinion demonstrate that defendants' conduct violates the 2008 Consent Order governing this case.


**IV.     CONCLUSION**

The Court finds that Provident's re-subdivision applications were initially assessed and recommended by staff for approval as a minor re-subdivision. The objections raised, by both the Planning Commission and the Parish Council, are irrelevant to the re-subdivision process and pretextual. As such, the Court concludes that had the proper procedures been followed, Provident's applications should have been treated as a minor re-subdivision applications.


Accordingly,

IT IS ORDERED, that the plaintiffs' Motion for Contempt is GRANTED.

IT IS FURTHER ORDERED that the issue of the amounts of damages, reasonable attorneys' fees and costs shall be REFERRED to Magistrate Judge Shushan for determination upon consent, or for Findings and Recommendation.

IT IS FURTHER ORDERED that Provident's four re-subdivision applications be placed on the agenda for the next calendar Planning Commission hearing.

New Orleans, Louisiana, this 17th day of August, 2009.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**