UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER, ET. AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 06-7185** |
| **ST. BERNARD PARISH, ET AL.** | **SECTION: "C" (1)** |

## ORDER AND REASONS

Before the Court is Plaintiff Greater New Orleans Fair Housing Action Center's ("GNO") and Intervenor Provident Realty Advisors, Inc.'s ("Provident") (collectively "Plaintiffs") Motion for Contempt. (Rec. Doc. 416). This Court held an evidentiary hearing on August 17 and 18, 2011, which covered the above Motion as well as this Court's Order requiring Defendants to show good cause why they should not be held in contempt for issuing the cease and desist orders described in Plaintiffs' Ex Parte Application for Temporary Restraining Order. (Rec. Docs. 460, 470). Based on the evidence and testimony produced by the parties, the arguments, post-hearing memoranda and other memoranda of counsel, the applicable law, and the record in this case, the Court GRANTS Plaintiffs' Motion and finds Defendants in contempt for the following reasons.

### I. Background

This protracted litigation arises from St. Bernard Parish's actions following the destruction of Hurricane Katrina. Shortly after the storm the Parish Council passed a moratorium on the "re-establishment and development of any multi-family dwellings in St. Bernard Parish." (Rec. Doc. 114 at 2). The Parish Council also passed an ordinance restricting the rental or occupancy of single family residences to the blood relatives of the owner. *Id.* The present lawsuit was filed to challenge these ordinances as violations of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*.

1

On February 27, 2008 this Court approved a consent order submitted by GNO and Defendants. (Rec. Doc. 114). Pursuant to the Consent Order, St. Bernard Parish was enjoined from:

> violating the terms of the federal Fair Housing Act, and 42 U.S.C. §§ 1981, 1982, and 1983. Specifically, St. Bernard Parish agrees that it shall not:
>
>> A.  Refuse to rent a dwelling unit, or otherwise make unavailable or deny a dwelling unit, to any person because of race or national origin;
>> B.  Deny minority citizens the same rights as are enjoyed by white citizens to make and enforce contracts;
>> C.  Deny minority citizens the same rights as are enjoyed by white citizens to lease, hold and otherwise enjoy real property;
>> D.  Deny any person equal protection of the law by discriminating on the basis of race and national origin in the leasing of real property; and,
>> E.  Retaliate against Plaintiffs or any other person who alleges that Defendants have violated the Fair Housing Act, 42 U.S.C. § 3601 et seq.

(Rec. Doc. 114 at ¶ 9). GNO and the Parish specifically agreed to the continuing jurisdiction of this Court for a period of three years from February 27, 2008 to resolve disputes regarding interpretation or compliance with the Consent Order. *Id.* at ¶ 12.

On January 14, 2011, Plaintiffs filed a motion for contempt arguing that Defendants had violated the February 27, 2008 Consent Order. (Rec. Doc. 416). Specifically, Plaintiffs allege that Defendants had impermissibly refused to renew Provident Reality Advisors Inc.'s ("Provident") building permits. (Rec. Doc. 426 at 12). Defendants maintain that they could not renew Provident's permits because those permits had expired and the Parish's Comprehensive Zoning Ordinance ("CZO") no longer permitted multi-unit dwellings on Provident's land. (Rec. Doc. 430 at 2). In response, Plaintiffs claim that "Defendants' pretextual reliance on the new zoning restrictions in refusing to renew Provident's permits...constitutes continuing discrimination." *Id.* at 13-14. Finally, Plaintiffs claim that Defendants' new CZO was an independent act of housing discrimination, which could not lawfully support Defendants' refusal to renew Provident's permits. *Id.*

Shortly after Plaintiffs filed their Motion for Contempt, Defendants issued Provident with

2

the renewed building permits it had requested. (Pltf. Ex. 35). Nevertheless, Provident was issued several cease-and-desist orders claiming that there were wetlands on two of Provident's building sites. (Rec. Doc. 456 at 8). On March 1, 2011 the Parish Council introduced an ordinance to rescind the CZO that Defendants claim prevented them from renewing Provident's building permits. (Rec. Doc. 462). However, on March 3, 2011, Defendants issued four additional cease-and-desist orders for all of Provident's building sites. (Rec. Doc. 467-2 at 1). Defendants justified these orders on the grounds that Provident's building permits were invalid because the CZO prohibited multi-unit housing on Provident's sites. *Id.*

On the following day this Court issued its March 4, 2011 Order, restraining Defendants from "[i]ssuing or enforcing any cease-and-desist orders or other stop-work orders against Provident Realty Advisors, Inc without prior approval of the Court." (Rec. Doc. 470 at 5). That order also required Defendants to show cause why their decision to issues the various cease-and-desist orders was not in contempt of this Court. *Id.*

## II. Law and Analysis

A "movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Whitcraft v. Brown*, 2009 WL 1492833, *2 (5th Cir. 2009) (citing *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992). Here the Consent Order was clearly in effect during the relevant action. Moreover, the Consent Order clearly required Defendants to refrain from "violating the terms of the federal Fair Housing Act." (Rec. Doc. 114 at ¶ 9). Therefore, the only question remaining is whether Defendants' challenged actions violated the Fair Housing Act.

The Fair Housing Act expressly prohibits discrimination in the provision of housing on the basis of race, color, religion, sex, familial status, or national origin. *See* 42 U.S.C. § 3601 *et seq*. The Act has been interpreted to prohibit municipalities from using their zoning powers in a manner that excludes housing for a group of people on the basis of one of the enumerated classifications. *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926 (2d Cir. 1988), *aff'd* 488 U.S. 15 (1988); *United States v. City of Black Jack*, 372 F.Supp. 319, 327 (E.D. Mo. 1974), *rev'd on other grounds*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975). Plaintiffs suing under the Fair Housing Act may establish liability by showing either intentional discrimination or by showing that the defendant's acts have a significant discriminatory effect. *Artisan/American Corp. v. City of Alvin, Tex.*, 588 F.3d 291, 295 (5th Cir. 2009) (citing *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996)); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986).

### A.    Plaintiffs' January 14, 2011 Motion for Contempt

####    1.    Intentional Discrimination

The Fifth Circuit has suggested that courts consider the following factors when determining discriminatory intent: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)).

*(1)    Historical Background of the Decision*

Here, the historical background of the decision clearly demonstrates that since Katrina the

Parish has been determined to obstruct the construction of multi-unit housing in the Parish. Prior to Katrina St. Bernard Parish was an overwhelmingly Caucasian parish, particularly in comparison to its neighbors. Based on 2000 census data, St. Bernard Parish, was 88.3 percent Caucasian and 7.6 percent African-American. (Def. Ex. 4C). Orleans Parish, which borders St. Barnard Parish, was 28.1 percent Caucasian and 67.3 percent African-American. *Id.* The racial composition for the entire New Orleans metropolitan area was 57.4 percent Caucasian and 37.4 percent African-American. *Id.*

On November 1, 2005, the Council enacted a twelve-month moratorium on the "re-establishment and development of any multi-family dwellings in St. Bernard Parish." (Rec. Doc. 114 at 2). Next, on September 19, 2006, the St. Bernard Parish Council enacted an ordinance, introduced by then Councilman Craig Taffaro, to prohibit the rental or occupancy of a single-family residence to someone other than a blood relative without first obtaining a permissive use permit. *Id.* Mr. Taffaro later stated that the purpose of the "blood relative" ordinance was to "maintain the demographics of St. Bernard Parish." (3/12/2009 Tr. at 318). Then on September 16, 2008, the Council enacted a moratorium prohibiting the construction of all "multi-family residential and/or any housing developments with five or more units for up to twelve (12) months or until such time as the Council approves these structures in the zoning updates to the St. Bernard Parish Code of Ordinances." (Pltf. Ex. 2). Next on September 15, 2009, Defendants briefly introduced a referendum on whether to amend the Parish Home Rule Charter to ban construction of multi-family housing with more than six units. (Rec Doc. 356-6). These events are what preceded Defendants' passage, on December 15, 2009, of the CZO, which eliminated 99.3 percent of the land available for multi-family housing in the Parish. (Pltf. Ex. 16).

*(2)     Specific Sequence of Events Leading Up to the CZO*

The specific events leading up to the CZO also demonstrates discriminatory intent because the basis for restricting multi-family housing in the CZO was pretextual. The challenged CZO eliminated multi-family dwellings as a permitted use in all but the R-3 zone in the Parish. (Pltf. Ex. 184 at 8). Before the CZO came into effect, 15,994 acres of land were available for use as multi-family dwellings, as of right. *Id* at 9. After the CZO came into effect only 109 acres of land were available for use as multi-family dwellings, as of right - a 99.3 percent reduction. *Id.* Defendants maintain that they drafted the CZO with the guidance of Dr. Poland, a city planning expert, and therefore they claim that the CZO was not drafted with any discriminatory intent, but rather as part of a longstanding effort to modernize the Parish's zoning ordinance. (Rec. Doc. 460 at 5). However, Dr. Poland testified that he made no recommendations about which zones should permit multi-family dwellings. (8/18/11 Tr. 331). Indeed, the St. Bernard Planning Commission Chairman, Earl Dauterive, informed Dr. Poland that multi-family dwellings would be restricted to the R-3 zone during a May 26, 2009 Planning Commission meeting:

> MR. DAUTERIVE:   ...One other thing in here that we had to look at was, in the chart on page 45, I think it is, we changed multi-family allowed only now in C-3. That was one change we made...
>
> MR. POLAND:   Earl, excuse me. What was your comment regarding multi-family?
>
> MR. DAUTERIVE:   We had changed where multi-families would only be allowed in C-3 zone.
>
> MR. POLAND:   Is that C-3 or R-3?
>
> MR. DAUTERIVE:   I'm sorry. R-3.

(Pltf. Ex. at 2-3).

At this Court's August 17, 2011 hearing, Mr. Dauterive testified that Defendants eliminated

6

multi-family dwellings as a permitted use in all but the R-3 zone because:

> "there was no real representative district or zoning for multifamily because it was mixed into C-1, C-2, I-1, and a number of different zones, and our idea was to get all of those particular multifamilies zoned properly so that they wouldn't be nonconforming uses any more, and we could actually get a count, because part of my, part of our requirement by the State is that we regulate density. And the only way we can regulate density is to actually get a count of what is out there. So we had no idea how many actual multifamily dwellings were out there."

(8/17/11 Tr. at 176-177). The Court does not find this explanation credible. The ability to count the number of multi-family dwellings in the Parish is not connected to zoning requirements. Moreover, prior to the adoption of the CZO, multi-family dwellings were a permitted use in C-1, C-2 and I-1, therefore multi-family dwellings in those zones were not zoned improperly. Finally, Mr. Dauterive's stated justification only addresses the decision to limit multi-family dwellings to a single zone; it does not explain why the R-3 zone was chosen in particular. This is significant because the R-3 zone represents a tiny portion of the Parish's available land, suggesting that the decision may have been taken with the intent to drastically limit the land available for multi-family dwellings.

Indeed, a video of Mr. Dauterive's testimony to the St. Bernard Parish Executive Finance Committee indicates that Mr. Dauterive may have had such an intent. In his testimony, Mr. Dauterive promoted the CZO on the grounds that it would drastically reduce the amount of space available to multi-family dwellings and give the Parish more control over future multi-family projects. (8/17/11 Tr. 168-169). The transcript of the relevant testimony reads as follows:

> MR. DAUTERIVE: One comment I wanted to make was about this total -- about the whole code. You know, we got in a real bad situation because the code wasn't in place and we got four developments we really didn't want in the Parish. I think now the Code, the way it is now, protects us very well against any developments that we're going to have a lot more say-so over the developments that come into the Parish. And any multifamilies are going to be -- have to come in for, most

7

> likely come in for a zoning change before they even get any kind of resubdivisions or anything because now multifamily is going to -- they'll be required to be an R-3 zone -- I mean an R-4 zone, and there is very little property in St. Bernard rated as R-4, I mean zoned at R-4.

*Id.* Before this Court Mr. Dauterive testified that when he voted in favor of the CZO he knew the it would limit the land available for multi-family dwellings in St. Bernard Parish. (8/17/11 Tr. at 170-171).

Thus, the history behind the CZO and the sequence of events leading up to it suggests that Defendants have doggedly attempted to preserve the pre-Katrina demographics of St. Bernard Parish. This effort began with an outright moratorium on multi-family dwelling and a requirement that renters be blood relatives of their landlords. The Court notes that, while previous findings of contempt have no bearing on whether Defendants were in contempt for actions at issue in the instant Motion, the historical background of the CZO, including previous findings of contempt, is a relevant factor for the Court to consider in the instant Motion. *Overton*, 871 F.2d at 540. In addition, regardless of previous findings of contempt, the specific sequence of events leading up to the CZO presents ample evidence of intentional discrimination. When the previous ordinances were challenged, Defendants reverted to alternative legal strategies such as a referendum and a new CZO. While Defendants argue that the CZO changes where envisioned well before the beginning of this lawsuit, the Court finds this explanation pretextual. Defendants' city planning expert testified that he made no recommendations about which zones should permit multi-family dwellings. (8/18/11 Tr. 331). Therefore the decision to eliminate 99.3 percent of land available for multi-family dwellings was made by Defendants, not their city planning expert. For the reasons explained above, this result demonstrates intent to discriminate against African Americans.

*(3)     Departures from the Normal Procedural Sequence*

The Court disagrees with Defendants' view that there is no evidence of departures from the normal procedure for planning activities. (Rec. Doc. 781 at 5). Defendants departed from normal procedure when they adopted the CZO without a master plan. (Pltf. Ex. 184 at 12). Zoning ordinances are not typically amended prior to the adoption of a master plan because the master plan establishes the goals that the zoning ordinance attempts to achieve. *Id*. Furthermore, the Court is convinced by Plaintiffs' expert Stephen Villavaso's testimony that failure to adopt a master plan violated both best planning practices and Louisiana law, La. Rev. Stat. 33:106. (8/17/11 Tr. at 77-78). Defendants maintain that such a sequence was required because the Parish was unable to afford the drafting of a master plan and land-use study, but could afford to redraft the CZO. (8/17/11 Tr. at 174-175). While the Court understands Defendants' fiscal restrictions, Defendants' particular course of action was clearly a departure from the normal procedural sequence.

*(4)     Substantive Departures*

Additionally, the Court finds that a substantive departure occurred. Substantive departures exist when "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267. The Court is persuaded that there is a continuing need for affordable housing in St. Bernard Parish, based on the testimony of Plaintiffs' affordable housing expert Kalima Rose. (8/17/11 Tr. At 125; Pltf. Ex. 183). This need was not considered when Defendants passed the CZO, since the CZO banned multi-family housing, which has been shown to be more affordable than single-family housing, from virtually all of St. Bernard Parish. Defendants point to their expert Donald Poland's testimony that there was an oversupply of housing in St. Bernard Parish, but they fail to counter the clear evidence of an undersupply of affordable housing. (8/18/11 Tr. At 331).

9

*(5)    Legislative History of the CZO*

Finally, the Court notes that the legislative history of the CZO suggests that race was a factor in its adoption. Significantly, Mr. Dauterive, advocated for the adoption of the CZO because in his opinion the Parish had been put in a "real bad situation" because the CZO had not been in place prior to Provident submitting its building applications. (8/18/11 Tr. at 168). Mr. Dauterive suggested that the CZO would help protect the Parish against similar developments in the future. *Id.* Therefore, the Court finds that the legislative history showing that Defendants adopted the CZO to "protect" themselves from similar projects suggests discriminatory intent.

Based on all of the evidence discussed above, the Court concludes that Defendants's intent in enacting the CZO was racially discriminatory, and as such Defendants have violated the Fair Housing Act, 42 U.S.C. §3601 *et seq*, and the terms of the Consent Order.

### 2.    Significant Discriminatory Effect

Even if Plaintiffs failed to establish intentional discrimination, they would still prevail as they have established that the CZO had a significant discriminatory effect. The Court relies on the four-factor test outlined in *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) to determine if Defendants have violated the Fair Housing Act. Under that test, a Court should consider:

> (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis*; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Id.* at 1290. The Seventh Circuit test ensures that finding a disparate racial impact is not a per se

violation of the Fair Housing Act. In contrast, the test established in *Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir. 1988), includes no assessment of intent. Although a sister court in this Circuit has relied on the standard announced in *Huntington*, in an abundance of caution this Court will apply the standard announced in *Arlington II*. *See Dews v. Town of Sunnyvale, Texas*, 109 F. Supp. 2d. 526, 564-569 (N.D. Texas 2000).

*1)      Strength of Showing of Disparate Racial Effect*

A racially disparate effect can be shown when a decision has a "greater adverse impact on one racial group than on another." *Arlington Heights II*, 558 F.2d at 1290. Based on the methodology of *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971), and *Wards Cove Packing Co., Inc. v. Antonio*, 490 U.S. 642, 650-651 (1989), the statistical analysis by Plaintiffs' statistical expert, Dr. Calvin Bradford, convinces the Court that the Defendants' actions created a significant discriminatory effect. Defendants presented no expert testimony countering Dr. Bradford on this matter.

Dr. Bradford has thirty-five years of experience in the area of housing discrimination, in the form of academic research as well as consulting and expert services in cases involving disparate impacts of housing policies or practices. (Pltf. Ex. 182 at 1-2). The results of his study assessing the impact of the CZO on African-Americans compared with Caucasians were statistically significant at a 99 percent confidence level, which is a more conservative number than the 95 percent confidence level commonly used in disparate impact cases. *Id.* at 7. As he put it, "[t]his means that at least 99% of the time one would expect that the actual percentage in the true population would fall within this confidence level." *Id.*

Dr. Bradford collected and analyzed data on African-Americans and Caucasians and populations living in structures with three or more units in the New Orleans metropolitan area to

determine whether the CZO's restriction on building structures with five or more units had a disparate impact on one group over the other. He established that African-American households, identified based on the race of the head of the household, are "almost twice (1.87 times) as likely to live in structures of three or more units when compared to white households." *Id.* at 8. The CZO restricted, by 99.3 percent, construction of a type of housing that African-Americans are nearly twice as likely to live in than whites. Thus, Dr. Bradford's results support the conclusion that the CZO had a "significant discriminatory effect" on African Americans because its ultimate effect tends to exclude minorities.

Contrary to Defendants' contention, the Eleventh Circuit's finding that Dr. Bradford's results in a case before it were "inherently speculative" does not affect his conclusions in the instant case because that criticism was specific to the facts and the methodology of that case. *Hallmark Developers, Inc. v. Fulton County*, 466 F.3d 1276, 1287 (11th Cir. 2006); *see* Rec. Doc. 763 at 23-24. In *Hallmark*, Dr. Bradford determined that a racial disparate impact existed by comparing the proportions of African Americans and whites who currently owned or rented a home within the price ranges of the proposed development. The speculativeness lay in the *price* variable in that Dr. Bradford's chosen price ranges "may not be the price at which the homes actually sell and the apartments actually rent." *Id.* at 1288. Here, Dr. Bradford evaluated racial disparate impact by comparing the percentage of African Americans and whites who live in multi-family versus single-family homes. Thus, the Court is not convinced that his conclusions in *Hallmark* weaken his conclusions in this case.

*2)     Some Evidence of Discriminatory Intent*

As this Court discussed previously, several aspects of this case provide substantial evidence of discriminatory intent, in particular the historical background of events, the sequence of events

leading up to the decision, the departure from normal zoning procedure, and Mr. Dauterive's statements. Even if such evidence is not sufficient to support a finding of the CZO's overall discriminatory intent, it indicates at a minimum some evidence of discriminatory intent.

3)      *Defendant's Interest in Amending the CZO to Limit Multi-Family Dwellings to R-3*

When asked why the Parish decided to limit multi-family dwellings to the R-3 zone, Mr. Dauterive stated that the Parish needed to get "multifamilies zoned properly" and that the Parish needed to count the number of multi-family dwellings that already existed in the Parish. (8/17/11 Tr. 176). These explanations are inadequate, as they do not address why such a drastic reduction of available land was required.

Defendants' city planning expert, Donald Poland, suggested that the Parish did not need any more multi-family dwellings because there was an abundance of available housing on the market. (8/18/11 Tr. at 342, 367). While the Court otherwise found Mr. Poland's testimony persuasive, Mr. Poland was not admitted as an expert in affordable housing, and therefore the Court does not credit Mr. Poland's testimony regarding the availability of such housing. Moreover, the Court notes that there is a continuing need for affordable housing in St. Bernard Parish. (Pltf. Ex. 183). At this Court's August 17-18, 2011 hearing Defendants failed to produce any evidence or expert testimony regard the availability of affordable housing in the Parish. In contrast, Plaintiffs produced an affordable housing expert, Kalima Rose, who testified that there is still a need for affordable housing in St. Bernard Parish. (8/17/11 Tr. at 125; Pltf. Ex. 183).

4)      *Relief Sought by the Plaintiff*

More fully stated, "does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." *Arlington II*, 558 F.2d at 1290.

13

This is clearly a case of the latter. In their Motion for Contempt, Plaintiffs do not seek an affirmative act from Defendants. Rather, Plaintiffs seek an order preventing Defendants from interfering with the construction of affordable housing sites.

Based on the factual record and judged under a clear and convincing evidence standard, the Court finds that the CZO has a discriminatory effect on African-Americans and violates the Fair Housing Act, 42 U.S.C. §3601 *et seq*, and the terms of the February 2008 Consent Order.

### B.    The Court's March 4, 2011 Order to Show Good Cause

Also before this Court is this Court's March 4, 2011 Order, which required defendants to show good cause why they should not be held in contempt for issuing cease-and-desist orders on Provident's sites. (Rec. Doc. 470).

Defendants justify the issuance of the cease-and-desist orders on the grounds that the CZO did not permit multi-family dwellings on Provident's properties. This Court has now found that CZO violated the Fair Housing Act and the terms of the February 2008 Consent Order. Therefore, the issuance of the cease-and-desist orders also violated the terms of the Consent Order under a clear and convincing evidence standard, as their only justification was the CZO. The Court also finds that this justification to be pretextual, as the CZO was in the process of being rescinded when Defendants issued the challenged cease-and-desist orders. (Rec. Docs. 462; 467-2 at 1).

### C.    Remedies

The only remaining remedies that Plaintiffs pray for are damages and fees. (Rec. Docs. 441, 416 at 2). The Fair Housing Act expressly allows courts to award reasonable attorneys' fees and costs to prevailing parties. 42 U.S.C. § 3613(c)(2); *see Dews*, 109 F. Supp. 2d. at 573.

### III. Conclusion

Accordingly,

IT IS ORDERED that Plaintiffs' Motion for contempt is GRANTED. (Rec. Doc. 416).

IT IS FURTHER ORDERED that Defendants are found in contempt for issuing cease-and-desist orders on Provident's building sites. (Rec. Doc. 460).

IT IS FURTHER ORDERED that the issue of the amounts of damages, reasonable attorneys' fees and costs shall be REFERRED to Magistrate Judge Shushan for determination upon consent, or for Findings and Recommendation.

New Orleans, Louisiana, this 17th day of October, 2011.

                                          **HELEN G. BERRIGAN**
                                          **UNITED STATES DISTRICT JUDGE**